IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LCCS GROUP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| A.N. WEBBER LOGISTICS, INC.; ACE | ) | COMPLAINT |
| DRILL CORPORATION; ACID PRODUCTS | ) | |
| COMPANY, INC.; AMERICAN NAME | ) | |
| PLATE & METAL DECORATING CO.; ASC | ) | |
| INC.; BARKER MANUFACTURING CO.; | ) | |
| BARTON SOLVENTS, INC.; BAY CAST | ) | |
| INC.; CARGILL, INC.; CBS CORPORATION; | ) | |
| CENTRAL MICHIGAN RAILWAY CO.; | ) | |
| CREATIVE FOAM CORP.; DUPAGE | ) | |
| COUNTY, ILLINOIS; ELECTROLUX HOME | ) | |
| PRODUCTS, INC.; ELMHURST MEMORIAL | ) | |
| HOSPITAL; ENAMELERS & JAPANNERS, | ) | |
| INC.; ENTHONE, INC.; ENVIRONMENTAL | ) | |
| SYSTEMS CO.; FARIBO MANUFACTURING | ) | |
| CO.; FEDERAL SIGNAL CORP.; FMC CORP.; | ) | |
| GC ELECTRONICS; THE GILLETTE | ) | |
| COMPANY; GREENFIELD INDUSTRIES, | ) | |
| INC.; HAMMOND SUZUKI USA, INC.; | ) | |
| INTERPLASTIC CORP.; JEWELL | ) | |
| INSTRUMENTS, LLC D/B/A TRIPLETT | ) | |
| TEST EQUIPMENT & TOOLS; JOHNSTON & | ) | |
| CHAPMAN INC.; JUSTRITE | ) | |
| MANUFACTURING CO., LLC; NOFIRE | ) | |
| CORP.; KERR CORP.; LENZ OIL SERVICE | ) | |
| PEORIA, INC.; OXY USA INC.; PAINT & | ) | |
| COATINGS VENTURES, INC.; PARKER- | ) | |
| HANNIFIN CORP.; PETER J. BOLT | ) | |
| SCAVENGER SERVICE, INC.; PLASTOMER | ) | |
| CORP.; REPLOGLE GLOBES PARTNERS | ) | |
| LLC; RIVERSIDE MFG., LLC; ROMO, INC. | ) | |
| D/B/A ROMO DURABLE GRAPHICS; | ) | |
| ROYAL ADHESIVES AND SEALANTS, LLC; | ) | |
| SI-TECH INDUSTRIES INC.; STEVE | ) | |
| GREGORY LANDSCAPING AND | ) | |
| SNOWPLOWING, INC.; UNITED STATES | ) | |

DEPARTMENT OF ENERGY; UNITED )
STEEL & WIRE COMPANY; VALLEY CITY )
DISPOSAL, INC.; VANDERHYDEN SEPTIC )
SERVICE CO.; VEOLIA ES INDUSTRIAL )
SERVICES, INC.; and WILSON SPORTING )
GOODS CO., )
 )
     Defendants. )

## COMPLAINT

For its Complaint, Plaintiff LCCS Group (hereinafter "Plaintiff" or "LCCS Group"), by and through counsel, alleges as follows:

### STATEMENT OF THE CASE

1.   This is a civil action pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). The LCCS Group asserts there has been a release and/or threat of release of hazardous substances from a facility known as the Lake Calumet Cluster Site ("LCCS Site") located in the City of Chicago, County of Cook, Illinois. These hazardous substances have contaminated the soil and groundwater at the LCCS Site and have threatened the public health and the environment.  Each of the Defendants generated and/or transported hazardous substances that were disposed of at the LCCS Site. This action seeks contribution of over $2 million in past response costs incurred by the LCCS Group at the LCCS Site in response to the release and threatened release of hazardous substances into the environment at and from the LCCS Site; and a declaration of each Defendant's liability for future response costs to be incurred by the LCCS Group members (and their assignors) at the LCCS Site.

## JURISDICTION AND VENUE

2.       This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 42 U.S.C. §§ 9607 and 9613.  The Court also has jurisdiction over the Second Claim for Relief to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

3.       Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the threatened and actual releases of hazardous substances that give rise to this action occurred and/or are occurring in this District and the LCCS Site is located in this District.

## ALLEGATONS COMMON TO ALL CLAIMS

4.       The LCCS Site encompasses approximately 87 acres and consists of the parcels commonly known as the Alburn/American Incineration, Inc. Site; the U.S. Drum II Site; the Unnamed Parcel Site; and the Paxton Avenue Lagoons Site; bounded by the Land and Lakes Landfill to the west, 122nd Street to the south, the Norfolk and Western Railroad right-of-way and Indian Ridge Marsh to the east, and Paxton I and II Landfills (119th Street) to the north, all in Chicago, Cook County, Illinois, as well as any area where hazardous substances that migrated from the LCCS Site have come to be located.

5.       The LCCS Site was originally wetlands. The LCCS Site began to be filled with slag from the steel industry and other waste (including construction debris, and municipal, industrial, and chemical waste) commencing around 1900, but remained predominantly wetlands until approximately 1949. Fill activities continued until the LCCS Site was raised to an elevation above the water table sometime in the 1960s.

6.        Within the LCCS Site, the Alburn/American Incineration, Inc. Site consists of approximately 9 acres. The Alburn/American Incineration, Inc. Site had a business address of

2200 East 119th Street, Chicago, Cook County, Illinois 60617. The Alburn/American Incineration, Inc. Site operated as a hazardous waste incineration and hazardous waste storage and transfer station facility. Storage methods included land filling, incineration, surface impoundment, and bulk liquid waste storage. The Alburn/American Incineration, Inc. Site continued accepting bulk waste until approximately January 1983.

7.      The United States Environmental Protection Agency ("EPA") performed an emergency removal action at the Alburn/American Incineration, Inc. Site between July and November of 1983, which included removal and off-site disposal of the contents of approximately 7,524 drums and other containers. EPA entered into an administrative settlement with certain potentially responsible parties ("PRPs") at the Alburn/American Incineration, Inc. Site in 1986, and entered into a consent decree with other PRPs at the Alburn/American Incineration, Inc. Site in 1988.

8.      Within the LCCS Site, the U.S. Drum II Site encompasses approximately 5.6 acres. The U.S. Drum II Site had a business address of 2400 East 119th Street, Chicago, Cook County, Illinois 60617. A waste transfer and solvent recovery facility was operated at the U.S. Drum II Site in the early 1970s until a fire in 1975, at which time the owner and/or operator abandoned operations, leaving behind approximately 1,750 drums. The U.S. Drum II Site resumed operations as a drum temporary storage and transfer facility in 1979. By March 1979, the Illinois Environmental Protection Agency ("IEPA") inspected the U.S. Drum II Site and identified an estimated 6,000 drums, four open dump lagoons of assorted sludge and liquid hazardous wastes, three bulk liquid trucks, and approximately 25 semi-trailers containing drums.

9.      The U.S. Drum II Site stopped accepting waste after April 1979 by order of the Cook County Circuit Court. Additional orders of May 1979 and August 1979 required site

4

closure and corrective measures, including construction of a berm to contain wastes, labeling, segregation, and removal of drums, and ultimately capping the U.S. Drum II Site. Between October 1979 and December 1979, an estimated 341,000 gallons of liquid and semi-solid wastes were removed from the U.S. Drum II Site. However, an estimated 1,750 drums were left on-site. IEPA inspection reports between January 1981 and October 1984 documented that approximately 50% of the drums left on-site were open, bulging, or leaking, and standing water on site was accelerating drum deterioration and causing the migration of contaminants.

10.     EPA performed a removal action at the U.S. Drum II Site from December 1984 through July 1985 and discovered buried drums in addition to the 1,750 drums left on-site. EPA removed all identifiable drums, 435 cubic yards of contaminated soil, and 62,000 gallons of standing water. Removal areas were leveled, capped with clay, covered with soil, graded and seeded.

11.     Within the LCCS Site, the Paxton Avenue Lagoons Site encompasses approximately 12 acres located north of 122nd Street, southwest of the Alburn/American Incineration Inc. Site, and west of the Unnamed Parcel Site, approximately one mile west of Lake Calumet, Cook County, Illinois. The Paxton Avenue Lagoons Site included three lagoons, a berm of soil and crushed drums, and an area of oily soils. The Paxton Avenue Lagoons Site lagoons were used during the 1940s and the Paxton Avenue Lagoons Site received various chemical wastes from nearby steel mills during its operations. IEPA sampled the Paxton Avenue Lagoons Site in 1985 and identified significant levels of volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polychlorinated biphenyls ("PCBs") and heavy metals, each of which are hazardous substances under CERCLA.

12.     EPA conducted an emergency removal action at the Paxton Avenue Lagoons Site in 1990, including removal of 60 drums of hazardous materials and 2,200 cubic yards of acidic soil. In 1992, IEPA incinerated PCBs, used the incinerated material for backfill and grading, and capped and bermed the Paxton Avenue Lagoons Site to contain surface water runoff. IEPA also constructed a pond on the southern border of the Paxton Avenue Lagoons Site.

13.     Within the LCCS Site, the Unnamed Parcel Site encompasses approximately 38 acres located south of the Alburn/American Incineration Inc. Site and the U.S. Drum II Site. The Unnamed Parcel Site received municipal, industrial, and chemical waste materials from the 1940s through the 1960s, with extensive fill operations during the 1960s, which buried solid waste as low as 30 feet below ground level.

14.     EPA completed three sampling reports for soil, surface water, and groundwater sampling at the LCCS Site dated November 30, 1999, August 2001, and September 27, 2002. These sampling reports identified hazardous substances such as benzene, iron, lead and manganese in groundwater, and elevated levels of ammonia-nitrogen in surface water at the Indian Ridge Marsh adjacent to the LCCS Site.

15.     On December 17, 2004, EPA sent Special Notice Letters to approximately 300 PRPs, including members of the LCCS Group, requesting participation in a Remedial Investigation and Feasibility Study ("RI/FS").

16.     On February 16, 2005, certain PRPs, including members of the LCCS Group, submitted a Good Faith Offer to reach a settlement with respect to the demands in the Special Notice Letter. EPA agreed to a moratorium on enforcement actions and proceeded with settlement negotiations with the responding PRPs. However, EPA terminated settlement negotiations in 2006 and transferred lead agency authority to the IEPA.

17.     IEPA continued response activities at the LCCS Site from 2006 through 2008.

18.     In March 2010, EPA listed the LCCS Site on the Superfund National Priorities List ("NPL").

19.     The LCCS Site has been separated into two Operable Units for purposes of the response activities being required by EPA and IEPA. Operable Unit 1 ("OU1") consists of the Alburn/American Incineration, Inc. Site; the U.S. Drum II Site; the Unnamed Parcel Site; and the Paxton Avenue Lagoons Site. Operable Unit 2 ("OU2") consists of the groundwater at or emanating from the LCCS Site.

20.     In 2012, certain PRPs, including members of the LCCS Group, voluntarily offered to conduct the RI/FS work at OU2.

21.     The members of the LCCS Group, entered into an "Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study," for OU2, CERCLA Docket NOV-W-12-C-013 ("OU2 RI/FS AOC") with EPA to determine the nature and extent of contamination in the groundwater entering at and emanating from the LCCS Site and any threat to the public health, welfare, or the environment caused by the release or threatened release of such hazardous substances, pollutants or contaminants; to collect sufficient data for identifying and evaluating groundwater remedial alternatives; and to conduct a Feasibility Study, which activities are not yet completed (OU2 RI/FS AOC attached as Exhibit A to this Complaint). Pursuant to Paragraph 110 of the OU2 RI/FS AOC, the effective date of the OU2 RI/FS AOC is June 17, 2013, which is fourteen days after it was signed by the Director of the Superfund Division on June 3, 2013.

22.     The OU2 RI/FS AOC also requires members of the LCCS Group to pay future response costs incurred by EPA at the LCCS Site after the effective date of the OU2 RI/FS AOC,

which are not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto ("NCP").

23.     To date, the hazardous substances identified at the LCCS Site include: acenaphthene, arsenic, benzene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, bis (2-ethylhexyl) phthalate, cadmium, calcium, chromium, copper, cyanide, fluoranthene, manganese, phenanthrene, polychlorinated biphenyls (PCBs), toluene and zinc.

24.     Through the date of the filing of this Complaint, the LCCS Group has incurred over $2 million in response costs at the LCCS Site.

25.     In addition, the LCCS Group has voluntarily incurred other response costs, including consultant and attorney's fees and expenses to search for other PRPs associated with the LCCS Site, and other consultant and attorney's fees and expenses that are closely tied to the response actions at the LCCS Site, which the LCCS Group is also entitled to recover against parties liable under CERCLA.

26.     The LCCS Group will continue to incur millions of dollars in response costs to conduct response actions at the LCCS Site required by EPA and/or the State of Illinois.

**THE PARTIES**

27.     The LCCS Group consists of the signatories to the OU2 RI/FS AOC (attached as Exhibit A hereto), in its own right, and as assignees of the CERCLA claims at the LCCS Site of the individual LCCS Group members and those entities that have settled or will settle with the LCCS Group and that have assigned or will assign such CERCLA claims to the LCCS Group.

28.     The LCCS Group is an association of companies that have entered into a written agreement with each other to perform, or cause to be performed the work and other obligations required by the terms of the OU2 RI/FS AOC. The LCCS Group members have periodically paid the LCCS Group's bank accounts funds necessary to cover the cost and administration of the work and other obligations required by the terms of the OU2 RI/FS AOC. On behalf of its members, the LCCS Group has entered into written agreements with third parties to perform environmental engineering, legal, accounting, community relations, investigation and other services relating to the Site, including the performance of the work and obligations required by the terms of the OU2 RI/FS. Among the purposes for which the LCCS Group was formed are to: (a) engage in community relations activities that will lead to a cooperative, appropriate and cost-effective response action at the LCCS Site, including providing input on NPL listing, remedy selection, PRP identification and end use to EPA and the many other interested stakeholders; (b) investigate the LCCS Site groundwater flow and possible contaminant sources by examining existing technical and historic data, identifying data gaps, preparing and implementing a work plan to fill the data gaps, and to provide appropriate guidance to the LCCS Group members regarding findings; (c) investigate LCCS Site history and operations to identify potential contamination sources and additional PRPs, and assist in developing a common database and understanding of the LCCS Site and operations conducted thereon over time so that a comprehensive allocation among all PRPs may be developed; (d) expand the universe of PRPs associated with the LCCS Site; (e) collect relevant LCCS Group member documents in a central repository, including preparing an adequate database of the existing volumetric data; (f) develop an allocation procedure that will lead to a comprehensive and equitable allocation; (g) collect funds for tasks authorized by the LCCS Group members, with recognition that LCCS Group

members' contributions will be credited in any final allocation reached for the LCCS Site; (h) allow any other purpose authorized by the LCCS Group members through the procedures and voting rights set forth in the LCCS Group members' participation agreement; and (i) monitor significant IEPA LCCS site work developments and public notice/comment announcements, reporting to the LCCS Group members thereon and taking appropriate action if necessary to protect the LCCS Group members' common interest in avoiding and/or minimizing alleged liability for future LCCS Site costs or remediation work.

29.     Defendant A.N. Webber Logistics, Inc. ("Webber Logistics") is formerly known as Strassy's Service System, Inc. ("Strassy's System").

30.     In or about 2009, Strassy's System changed its name to Webber Logistics.

31.     Webber Logistics has a principal place of business at 2150 US-45, Kankakee, Illinois.

32.     Webber Logistics is in the business of specialized freight and long distance trucking.

33.     According to LCCS Site records, Strassy's System by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following waste containing hazardous substances owned or possessed by Strassy's System: "waste ink materials" on or about June 29, 1979; and "misc. waste ink solvents" on or about July 30, 1979, totaling at least 12,485 gallons, at the LCCS Site.

34.     These types of waste streams from a company such as Strassy's System can contain hazardous materials such as acetone, benzene, chromium, ethyl benzene, manganese, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

10

35.     By letter dated November 20, 2015, the LCCS Group notified Webber Logistics of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site; and offered Webber Logistics the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

36.     To date, Webber Logistics has not paid its equitable share of LCCS Site response costs.

37.     Defendant ACE Drill Corporation ("ACE Drill") has a principal place of business at 2600 East Maumee Street, Adrian, Michigan.

38.     ACE Drill is in the business of manufacturing high-speed steel tools, such as standard drills, drill and reamer blanks, drill rods, taper routers and custom drills.

39.     According to LCCS Site records, ACE Drill by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 150 gallons of trichloroethylene on or about December 8, 1980, which contained hazardous substances owned or possessed by ACE Drill, at the LCCS Site.

40.     By letter dated November 20, 2015, the LCCS Group notified ACE Drill of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site; and offered ACE Drill the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

41.     To date, ACE Drill has not paid its equitable share of LCCS Site response costs.

42.     Defendant Acid Products Company, Inc. ("Acid Products") is the successor to Barker Chemical Co. ("Barker Chemical").

43. Barker Chemical was formed as a Delaware corporation on or about January 31, 1962.

44. Barker Chemical was in the business of solvent reclamation, primarily operating in Chicago, Illinois.

45. Acid Products was formed as an Illinois corporation on or about January 17, 1986.

46. Barker Chemical was formed as an Illinois corporation on or about April 17, 1990.

47. On or about December 26, 1990, Barker Chemical amended its name to The Barker Company with the Illinois Secretary of State.

48. On or about February 28, 1991, The Barker Company was filed as a for-profit foreign corporation with the Indiana Secretary of State, with incorporators Wayne Barker and Jann L. Fisher.

49. On or about November 12, 1993, The Barker Company was revoked by the Indiana Secretary of State.

50. On or about September 1, 1994, The Barker Company was dissolved by the Illinois Secretary of State.

51. Despite being revoked by the Indiana Secretary of State, The Barker Company filed a Notice of Change of Registered Office or Registered Agent with the Indiana Secretary of State on September 4, 2000 and July 6, 2004.

52. The last officers on record for The Barker Company with the Indiana Secretary of State were Wayne Barker, Jann L. Fisher and Michael S. Fisher, all with address 600 West 41st

Street, Chicago, Illinois. Additionally, The Barker Company's last address on file is "c/o Acid Products C., Inc.," also at 600 West 41st Street, Chicago, Illinois.

53.     Acid Products is currently active with the Illinois Secretary of State, with last officers on record as President Jann L. Fisher and Secretary Michael Fisher, both with address 600 West 41st Street, Chicago, Illinois.

54.     Acid Products has a principal place of business at 600 West 41st Street, Chicago, Illinois.

55.     Acid Products is in the business of chemical distribution, specializing in packaging and distribution of corrosive and dry chemicals.

56.     According to LCCS Site records, Barker Chemical by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Barker Chemical: 4,500 gallons of waste on or about February 2, 1977; 5,280 gallons of waste on or about July 17, 1978; 4,150 gallons of waste on or about November 9, 1978; 4,150 gallons of waste on or about November 10, 1978; 4,200 gallons of waste on or about November 15, 1978; 4,200 gallons of waste on or about November 17, 1978; 4,500 gallons of waste on or about November 21, 1978; 5,000 gallons of waste on or about December 1, 1978; 8,400 gallons of waste on or about December 5, 1978; 3,000 gallons of waste on or about December 13, 1978; 4,400 gallons of "carbon tetrachloride, ethanol, ethyl acetate, chlorobenzene, xylene trichloro, xylene, ethyl benzoate and chloroacetylenes" on or about December 13, 1978; 4,000 gallons of waste on or about January 29, 1979; 2,000 gallons of waste on or about February 3, 1979; 8,900 gallons of waste on or about February 7, 1979; 4,500 gallons of waste on or about February 9, 1979; 4,400 gallons of waste on or about February 13,

13

1979; 4,300 gallons of waste on or about February 22, 1979; 4,300 gallons of waste on or about

March 8, 1979; 4,345 gallons of "plasticizer resin monomer elastomer residues" on or about

March 23, 1979; 8,700 gallons of "sludge" on or about March 26, 1979; 4,300 gallons of waste

on or about March 27, 1979; 13,500 gallons of waste on or about May 20, 1979; 5,000 gallons of

"solvents" on or about May 23, 1979; 9,000 gallons of "sludge" on or about May 29, 1979; 9,000

gallons of waste on or about June 4, 1979; 4,500 gallons of waste on or about June 12, 1979;

18,000 gallons of waste on or about June 16, 1979; 9,000 gallons of waste on or about June 20,

1979; 4,500 gallons of waste on or about June 26, 1979; 4,500 gallons of waste on or about June

29, 1979; 9,000 gallons of waste on or about July 3, 1979; 4,500 gallons of waste on or about

July 10, 1979; 4,500 gallons of waste on or about July 17, 1979; 33,500 gallons of "solvents" on

or about July 20, 1979; 4,100 gallons of "sludge solvent" on or about July 27, 1979; 3,800

gallons of "solvent sludge" on or about August 1, 1979; 4,895 gallons of waste on or about

August 20, 1979; 4,500 gallons of waste on or about August 24, 1979; 4,500 gallons of waste on

or about September 4, 1979; 13,000 gallons of waste on or about September 10, 1979; 6,600

gallons of waste on or about September 12, 1979; 12,000 gallons of "waste solvents sludge" on

or about September 12, 1979; 4,500 gallons of waste on or about November 14, 1979; and 4,500

gallons of waste on or about November 23, 1979, totaling at least 292,420 gallons, at the LCCS

Site.

57.    By letter dated November 20, 2015, the LCCS Group notified Acid Products of

the existence of the release or threatened release of hazardous substances at the LCCS Site, and

that the LCCS Group intended to take steps to eliminate the release or threatened release of

hazardous substances at the LCCS Site, and offered Acid Products the opportunity to voluntarily

join in the LCCS Group's efforts at the LCCS Site.

58.     To date, Acid Products has not paid its equitable share of LCCS Site response costs.

59.     Defendant American Name Plate & Metal Decorating Co. ("American Decorating") has a principal place of business at 4501 South Kildare Avenue, Chicago, Illinois.

60.     American Decorating is in the business of manufacturing etched metal nameplates, screen printed metal nameplates, flexible decals, tags and overlays, bar coded nameplates and labels, domed labels, and various metal fabrication and specialty products.

61.     According to LCCS Site records, American Decorating by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by American Decorating: 1,705 gallons of waste on or about April 23, 1975; 1,045 gallons of waste on or about August 20, 1976; 880 gallons of waste on or about December 28, 1976; 1,980 gallons of "acid" on or about March 30, 1978; 3,455 gallons of "acid" on or about June 1, 1978; 990 gallons of waste on or about December 6, 1978; and 1,430 gallons of waste on or about March 22, 1979, totaling at least 11,485 gallons, at the LCCS Site.

62.     These types of waste streams from a company such as American Decorating can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

63.     By letter dated November 20, 2015, the LCCS Group notified American Decorating of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened

release of hazardous substances at the LCCS Site, and offered American Decorating the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

64.     To date, American Decorating has not paid its equitable share of LCCS Site response costs.

65.     Defendant ASC Inc. ("ASC") has a principal place of business at 6115 East 13 Mile Road, Warren, Michigan.

66.     ASC is in the business of designing, engineering and manufacturing specialty vehicle programs.

67.     According to LCCS Site records, ASC by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by ASC: "waste paint" and "waste thinning" on or about July 30, 1982; "waste paint" and "waste thinning" on or about August 5, 1982; "waste oil" and "waste thinning" on or about August 24, 1982; "waste thinning" on or about August 27, 1982; and "drums" on or about August 24, 1983, totaling at least 10,395 gallons, at the LCCS Site.

68.     These types of waste streams from a company such as ASC can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

69.     By letter dated April 4, 2016, the LCCS Group notified ASC of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous

substances at the LCCS Site; and offered ASC the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

70.    To date, ASC has not paid its equitable share of LCCS Site response costs.

71.    Defendant Barker Manufacturing Co. ("Barker") has a principal place of business at 1125 Watkins Road, Battle Creek, Michigan.

72.    Barker is in the business of manufacturing RV parts and accessories.

73.    According to LCCS Site records, Barker by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Barker: 55 gallons of "xylene" on or about December 8, 1981; 55 gallons of "cyclohexanone" on or about December 8, 1981; 55 gallons of "tetrhydrofuran" on or about December 8, 1981; 275 gallons of "aluminum paint" on or about December 8, 1981; 55 gallons of "enamel paint" on or about December 8, 1981; and 550 gallons of "zolv" on or about December 8, 1981, totaling at least 1,045 gallons, at the LCCS Site.

74.    By letter dated November 20, 2015, the LCCS Group notified Barker of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Barker the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

75.    To date, Barker has not paid its equitable share of LCCS Site response costs.

76.    Defendant Barton Solvents, Inc. ("Barton Solvents") has a principal place of business at 1920 Northeast Broadway, Des Moines, Iowa.

17

77.     Barton Solvents is in the business of chemical distribution, testing and transportation.

78.     According to LCCS Site records, Barton Solvents by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 4,345 gallons of "liquid solvents" on or about March 31, 1978, which contained hazardous substances owned or possessed by Barton Solvents, at the LCCS Site.

79.     These types of waste streams from a company such as Barton Solvents can contain hazardous materials such as acetone, benzene, chromium, ethyl benzene, manganese, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

80.     By letter dated November 20, 2015, the LCCS Group notified Barton Solvents of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Barton Solvents the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

81.     To date, Barton Solvents has not paid its equitable share of LCCS Site response costs.

82.     Defendant Bay Cast Inc. ("Bay Cast") has a principal place of business at 2611 Center Avenue, Bay City, Michigan.

83.     Bay Cast is in the business of manufacturing steel castings, base, floor and surface plates, and provides large-format precision machining services.

84.     According to LCCS Site records, Bay Cast by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 375 gallons of "hazardous waste, liquid nos (material known as polymeric

isocyamate)" on or about November 8, 1982, which contained hazardous substances owned or possessed by Bay Cast, at the LCCS Site.

85.     By letter dated November 20, 2015, the LCCS Group notified Bay Cast of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Bay Cast the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

86.     To date, Bay Cast has not paid its equitable share of LCCS Site response costs.

87.     Defendant Cargill, Inc. ("Cargill") has a principal place of business at 15407 McGinty Road, Wayzata, Minnesota.

88.     Cargill is in the business of providing food, agriculture, financial and industrial products and services.

89.     According to LCCS Site records, Cargill by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Cargill: 4,400 gallons of waste on or about January 30, 1976; 4,400 gallons of waste on or about February 26, 1976; 4,400 gallons of waste on or about April 16, 1976; 4,400 gallons of waste on or about July 20, 1976; 4,400 gallons of waste on or about July 28, 1976; 4,400 gallons of waste on or about August 13, 1976; 4,400 gallons of waste on or about August 28, 1976; 4,400 gallons of waste on or about October 8, 1976; 4,400 gallons of waste on or about October 26, 1976; 4,400 gallons of waste on or about March 23, 1978; 3,630 gallons of waste on or about March 28, 1978; 4,400 gallons of waste on or about April 18, 1978; 4,400 gallons of waste on or about May 9, 1978; 4,400 gallons of waste on or about May 31, 1978; 4,400 gallons of waste on

or about June 9, 1978; 4,400 gallons of waste on or about June 13, 1978; 4,400 gallons of waste on or about June 19, 1978; 4,400 gallons of waste on or about June 20, 1978; 4,400 gallons of waste on or about July 7, 1978; 4,400 gallons of waste on or about August 2, 1978; 4,400 gallons of waste on or about August 8, 1978; 4,400 gallons of waste on or about August 23, 1978; 4,400 gallons of waste on or about August 24, 1978; 4,400 gallons of "full waste" on or about August 29, 1978; 4,400 gallons of waste on or about September 13, 1978; 4,400 gallons of waste on or about September 22, 1978; 4,400 gallons of waste on or about September 30, 1978; 4,235 gallons of waste on or about October 18, 1978; 4,400 gallons of waste on or about November 7, 1978; 4,400 gallons of waste on or about January 4, 1979; 4,400 gallons of waste on or about January 31, 1979; 4,400 gallons of waste on or about February 14, 1979; and 4,400 gallons of waste on or about March 2, 1979, totaling at least 144,265 gallons, at the LCCS Site.

90.     These types of waste streams from a company such as Cargill can contain hazardous materials such as acetone, barium, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, ethyl benzene, lead, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

91.     To date, Cargill has not paid its equitable share of LCCS Site response costs.

92.     Defendant CBS Corporation ("CBS") is formerly known as Westinghouse Electric Corporation ("Westinghouse").

93.     In or about December 1997, Westinghouse changed its name to CBS.

94.     CBS has a principal place of business at 51 West 52nd Street, New York, New York.

95.     Westinghouse was in the business of electrical engineering, appliance manufacturing, power generation and mass media production.

96.     According to LCCS Site records, Westinghouse by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Westinghouse: 800 gallons of "waste liquid paint" on or about September 22, 1982; 500 gallons of "waste cement" on or about September 22, 1982; and 50 gallons of "waste xylol" on or about September 22, 1982, totaling at least 1,350 gallons, at the LCCS Site.

97.     By letter dated November 20, 2015, the LCCS Group notified CBS of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered CBS the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

98.     To date, CBS has not paid its equitable share of LCCS Site response costs.

99.     Defendant Central Michigan Railway Co. ("Central Michigan Railway") is the successor to Lakeshore Terminal and Pipeline Co. ("Lakeshore Terminal").

100.    On or about December 22, 1987, Ottawa Equipment Company was merged with and into Lakeshore Terminal, with Lakeshore Terminal as the surviving corporation, and with the name of the surviving corporation amended to Bay Services Corporation ("Bay Services").

101.    On or about June 22, 2006, Bay Development Company, D.M. Central Transportation, Inc. ("D.M. Central") and Bay Services were merged with and into each other, with D.M. Central as the surviving corporation, whose assumed name then became Bay Services.

102.    On or about June 23, 2006, D.M. Central was merged with and into Detroit and Mackinac Railway Company ("Detroit and Mackinac"), with Detroit and Mackinac as the surviving corporation, whose assumed names then became Bay Services and D.M. Central.

103.    On or about June 26, 2006, Detroit and Mackinac was merged with and into Central Michigan Railway, with Central Michigan Railway as the surviving corporation, whose assumed names then became Bay Services, D.M. Central and Detroit and Mackinac.

104.    Central Michigan Railway has a principal place of business at 1424 Straits Drive, Bay City, Michigan.

105.    Lakeshore Terminal was in the business of railroad operations.

106.    According to LCCS Site records, Lakeshore Terminal by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 2,800 gallons of "fuel, aviation and water" on or about June 24, 1982, which contained hazardous substances owned or possessed by Lakeshore Terminal, at the LCCS Site.

107.    These types of waste streams from a company such as Lakeshore Terminal can contain hazardous materials such as acetone, benzene, chromium, ethyl benzene, manganese, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

108.    By letter dated November 20, 2015, the LCCS Group notified Central Michigan Railway of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Central Michigan Railway the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

109.    To date, Central Michigan Railway has not paid its equitable share of LCCS Site response costs.

110.    Defendant Creative Foam Corp. ("Creative Foam") has a principal place of business at 300 North Alloy Drive, Fenton, Michigan.

111.    Creative Foam is in the business of die-cut formed foams and composite core kitting.

112.    According to LCCS Site records, Creative Foam by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 385 gallons of "flammable liquid NOS" on or about June 11, 1982, which contained hazardous substances owned or possessed by Creative Foam, at the LCCS Site.

113.    These types of waste streams from a company such as Creative Foam can contain hazardous materials such as acetone, benzene, cadmium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

114.    By letter dated November 20, 2015, the LCCS Group notified Creative Foam of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Creative Foam the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

115.    To date, Creative Foam has not paid its equitable share of LCCS Site response costs.

116.    Defendant DuPage County, Illinois ("DuPage County") has a principal place of business at 421 North County Farm Road, Wheaton, Illinois.

117.    According to LCCS Site records, DuPage County Highway Department by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 1,650 gallons of waste on or about April 12,

1978, which contained hazardous substances owned or possessed by DuPage County Highway

Department, at the LCCS Site.

118.    These types of waste streams from a entity such as DuPage County can contain

hazardous materials such as acetone, benzene, chromium, dichloroethylene, ethyl benzene,

manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane,

trichloroethylene, vinyl chloride, xylenes and/or zinc.

119.    By letter dated November 20, 2015, the LCCS Group notified DuPage County of

the existence of the release or threatened release of hazardous substances at the LCCS Site, and

that the LCCS Group intended to take steps to eliminate the release or threatened release of

hazardous substances at the LCCS Site, and offered DuPage County the opportunity to

voluntarily join in the LCCS Group's efforts at the LCCS Site.

120.    To date, DuPage County has not paid its equitable share of LCCS Site response

costs.

121.    Defendant Electrolux Home Products, Inc. ("Electrolux Products") has a principal

place of business at 10200 David Taylor Drive, Charlotte, North Carolina.

122.    Electrolux Products is the successor to Belding Products Corp. ("Belding

Products").

123.    Gibson Refrigerator Co. ("Gibson Refrigerator") operated an air-conditioner plant

in Belding, Michigan, under the name Belding Products.

124.    In or about 1967, Gibson Refrigerator was acquired by White Consolidated

Industries Inc. ("White Consolidated").

125.    In or about 1988, Belding Products ceased operations at its Belding, Michigan

plant.

126. On or about May 2, 2002, White Consolidated was merged with and into WCI Outdoor Products, Inc. under the name Electrolux Products.

127. According to LCCS Site records, Belding Products by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Belding Products: 605 gallons of "waste – paint" on or about May 18, 1982; 220 gallons of "waste – toluene" on or about May 18, 1982; 275 gallons of "waste – cement liq. nos" on or about May 18, 1982; and 440 gallons of "waste – methylene chloride" on or about May 18, 1982, totaling at least 1,540 gallons, at the LCCS Site.

128. These types of waste streams from a company such as Belding Products can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, silver, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

129. Additionally, Electrolux Products is the successor to Greenville Products Co. ("Greenville Products").

130. Greenville Products was a division of White Consolidated, which operated a plant in Greenville, Michigan.

131. Greenville Products was in the business of refrigerator and appliance manufacturing.

132. On or about May 2, 2002, White Consolidated was merged with and into WCI Outdoor Products, Inc. under the name Electrolux Products.

133. According to LCCS Site records, Greenville Products by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for

disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Greenville Products: 510 gallons of "waste toluene diisocyanate" on or about April 22, 1982; 1,250 gallons of "waste flammable liquid n.o.s." on or about April 22, 1982; and 1,500 gallons of "waste flammable liquid n.o.s." on or about May 27, 1982, totaling at least 3,260 gallons, at the LCCS Site.

134.    These types of waste streams from a company such as Greenville Products can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, silver, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

135.    Additionally, Electrolux Products is the successor to G.R. Manufacturing Co. ("G.R. Manufacturing") and Kelvinator Inc. ("Kelvinator").

136.    In or about 1968, White Consolidated acquired Kelvinator.

137.    G.R. Manufacturing was a division of Kelvinator, which manufactured kitchen ranges at a plant in Grand Rapids, Michigan.

138.    In or about 1988, G.R. Manufacturing ceased operations at its Grand Rapids, Michigan plant.

139.    On or about May 2, 2002, White Consolidated was merged with and into WCI Outdoor Products, Inc. under the name Electrolux Products.

140.    According to LCCS Site records, G.R. Manufacturing by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by G.R. Manufacturing: 385 gallons of "toluene diisocynate waste & methylene chloride waste, poison B" on or about January 21, 1982; 220 gallons of "hazardous waste liquid,

polyether resin" on or about January 21, 1982; 165 gallons of "liquid, polyether resin & trichloromonofluromethane" on or about July 8, 1982; 165 gallons of "waste toulene [sic] diisocyanate" on or about July 8, 1982; 165 gallons of "poly, resin & trichloromonofluromethane" on or about July 9, 1982; 4,400 gallons of "waste paint sludge (solids), 10 (liquid), cadmium, total chromium, copper, grease & oil, lead nickel" on or about July 20, 1979; 550 gallons of "waste methylene chloride" on or about September 13, 1982; 605 gallons of "waste methylene chloride" on or about October 5, 1982; 275 gallons of "waste (TDI) toluene diisocyanate" on or about October 5, 1982; and 330 gallons of "waste oil, nos, combustible" on or about October 5, 1982, totaling at least 7,260 gallons, at the LCCS Site.

141.     Additionally, Electrolux Products is the successor to Roper Outdoor Products ("Roper Products").

142.     Roper Corp.'s lawn equipment manufacturing business was also known as Roper Products, located in Bradley, Illinois.

143.     Roper Products was in the business of manufacturing lawn equipment.

144.     In or about April 1988, General Electric Company acquired Roper Corp., and this acquisition included Roper Corp.'s lawn equipment manufacturing business also known as Roper Products.

145.     In or about November 1988, White Consolidated acquired Roper Products from General Electric Company.

146.     On or about May 2, 2002, White Consolidated was merged with and into WCI Outdoor Products, Inc. under the name Electrolux Products.

147.     According to LCCS Site records, Roper Products by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for

disposal or treatment, 1,980 gallons of "old junk paint & solvents" on or about July 27, 1979, which contained hazardous substances owned or possessed by Roper Products, at the LCCS Site.

148.    These types of waste streams from a company such as Roper Products can contain hazardous materials such as acetone, benzene, cadmium, chromium, cobalt, copper, dichloroethylene, ethyl benzene, lead, manganese, methyl ethyl ketone, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

149.    By letter dated November 20, 2015, the LCCS Group notified Electrolux Products of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Electrolux Products the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

150.    To date, Electrolux Products has not paid its equitable share of LCCS Site response costs.

151.    Defendant Elmhurst Memorial Hospital ("Elmhurst Hospital") has a principal place of business at 155 East Brush Hill Road, Elmhurst, Illinois.

152.    Elmhurst Hospital is in the business of providing medical treatment.

153.    Elmhurst Hospital by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 110 gallons of waste, which contained hazardous substances owned or possessed by Elmhurst Hospital, at the LCCS Site.

154.    These types of waste streams from an entity such as Elmhurst Hospital can contain hazardous materials such as arsenic, cadmium, chromium, copper, lead, mercury, methyl ethyl ketone, methylene chloride, trichloroethane, trichloroethylene and/or zinc.

155.     By letter dated March 14, 2016, the LCCS Group notified Elmhurst Hospital of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Elmhurst Hospital the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

156.     To date, Elmhurst Hospital has not paid its equitable share of LCCS Site response costs.

157.     Defendant Enamelers & Japanners, Inc. ("Enamelers & Japanners") has a principal place of business at 8649 West Stolting Road, Niles, Illinois.

158.     Enamelers & Japanners is in the business of metal finishing and silk screening, both powder and liquid coating.

159.     According to LCCS Site records, Enamelers & Japanners by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Enamelers & Japanners: 1,265 gallons on or about December 26, 1978; 1,265 gallons on or about February 27, 1979; and 1,540 gallons on or about March 20, 1979, totaling at least 4,070 gallons, at the LCCS Site.

160.     These types of waste streams from a company such as Enamelers & Japanners can contain hazardous materials such as chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene and/or xylenes.

161.     By letter dated November 20, 2015, the LCCS Group notified Enamelers & Japanners of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened

release of hazardous substances at the LCCS Site, and offered Enamelers & Japanners the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

162.    To date, Enamelers & Japanners has not paid its equitable share of LCCS Site response costs.

163.    Defendant Enthone, Inc. ("Enthone") has a principal place of business at 350 Frontage Road, West Haven, Connecticut.

164.    Enthone is in the business of the manufacture, sale, and distribution of functional and decorative coatings, printed circuit board fabrication chemistry and microelectronics materials.

165.    According to LCCS Site records, Enthone by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 935 gallons of waste, which contained hazardous substances owned or possessed by Enthone, at the LCCS Site.

166.    These types of waste streams from a company such as Enthone can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, toluene, trichloroethane, trichloroethylene, zinc and/or xylenes.

167.    By letter dated November 20, 2015, the LCCS Group notified Enthone of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Enthone the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

168.    To date, Enthone has not paid its equitable share of LCCS Site response costs.

169. Defendant Environmental Systems Co. ("Environmental Systems") is the successor to Great Lakes Environmental Services Inc. ("Great Lakes Environmental").

170. On or about April 2, 1987, Great Lakes Environmental was merged with and into Ensco, Inc., a fictitious name of Environmental Systems Co.

171. Environmental Systems has a principal place of business at 180 Technology Parkway, Norcross, Georgia.

172. Environmental Systems is in the business of hazardous waste disposal.

173. According to LCCS Site records, Great Lakes Environmental accepted for transport to the LCCS Site, which was selected by Great Lakes Environmental, the following amounts of waste containing hazardous substances: 440 gallons of "pentone 602 solvent, combustible" on or about April 13, 1982; 385 gallons of "flammable liquid, NOS" on or about June 11, 1982; 192 gallons of "hazardous waste, liquid, NOS" on or about June 23, 1982; 55 gallons of "FL" on or about August 12, 1982; 165 gallons of "FL. NOS" on or about August 17, 1982; 4,345 gallons of "flammable liquid, NOS" on or about October 29, 1982; 4,345 gallons of "still bottoms" and 4,290 gallons of "resin & paint, filter scrap, seeds, still bottoms" on or about November 12, 1982; 4,180 gallons of "resin & paint, filtering wastes, seeds, still bottoms" on or about November 15, 1982; 4,235 gallons of "overstock paint resin, filtering wastes, seeds, still bottoms; 3% CL, 2.14% ash, 10661 BTUs/lb"; and 4,180 gallons of "resin" on or about November 16, 1982; and 4,070 gallons of "W FL NOS" on or about November 17, 1982, totaling at least 30,882 gallons.

174. The waste streams transported by Great Lakes Environmental likely contained some or all of the following hazardous substances such as acetone, chromium, copper,

dichloroethylene, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

175.    The waste streams Great Lakes Environmental transported to the LCCS Site were generated by Consumers Power Company; Defendant Creative Foam Corp.; Ethyl Corporation; Federal-Mogul Corp.; and Glasurit America, Inc.

176.    By letter dated November 20, 2015, the LCCS Group notified Environmental Systems of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Environmental Systems the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

177.    To date, Environmental Systems has not paid its equitable share of LCCS Site response costs.

178.    Defendant Faribo Manufacturing Co. ("Faribo Manufacturing") has a principal place of business at 619 Park Avenue Northwest, Faribault, Minnesota.

179.    Faribo Manufacturing is in the business of specialized plastics molding.

180.    According to LCCS Site records, Faribo Manufacturing by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Faribo Manufacturing: 2,970 gallons of "paint sludge;" 4,125 gallons of "FL" and 55 gallons of "corrosive" on or about February 18, 1982; 4,620 gallons of "weak flame, watery" on or about February 24, 1982; and 990 gallons of "paint sludge" and 2,530 gallons of "ELAMO" on or about March 4, 1982, totaling at least 15,290 gallons, at the LCCS Site.

181.    These types of waste streams from a company such as Faribo Manufacturing can contain hazardous materials such as acetone, copper, dichloroethylene, lead, methyl ethyl ketone, toluene and/or xylenes.

182.    By letter dated November 20, 2015, the LCCS Group notified Faribo Manufacturing of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Faribo Manufacturing the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

183.    To date, Faribo Manufacturing has not paid its equitable share of LCCS Site response costs.

184.    Defendant Federal Signal Corp. ("Federal Signal") has a principal place of business at 1415 West 22nd Street, Suite 1100, Oak Brook, Illinois.

185.    Federal Signal is in the business of designing and manufacturing sewer cleaners, vacuum trucks, street sweepers, waterblasters, safety and security systems, including technology-based products and solutions for the public safety market.

186.    According to LCCS Site records, Federal Signal by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Federal Signal: 150 gallons of "spent flux & thinner, flammable liquid, nos" on or about September 16, 1982; 200 gallons of "spent bath oil, flammable liquid, nos" on or about September 16, 1982; and 11,000 gallons of "spent bath oil" on or about September 16, 1982, totaling at least 11,350 gallons, at the LCCS Site.

187.    These types of waste streams from a company such as Federal Signal can contain hazardous materials such as acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

188.    Additionally, Federal Signal is formerly known as Federal Sign and Signal Corp. ("Federal Sign").

189.    In or about 1975, Federal Sign changed its name to Federal Signal.

190.    According to LCCS Site records, Federal Sign by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Federal Sign: 4,840 gallons of "liquid" on or about August 16, 1979; and 3,300 gallons of "liquid" on or about August 16, 1979, totaling at least 8,140 gallons, at the LCCS Site.

191.    These types of waste streams from a company such as Federal Sign can contain hazardous materials such as acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

192.    By letter dated November 20, 2015, the LCCS Group notified Federal Signal of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Federal Signal the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

193.    To date, Federal Signal has not paid its equitable share of LCCS Site response costs.

194.    Defendant FMC Corp. ("FMC") has a principal place of business at 1735 Market Street, Philadelphia, Pennsylvania.

195.    FMC is in the business of developing, manufacturing and distributing chemicals for the agricultural, consumer and industrial markets.

196.    According to LCCS Site records, FMC by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 2,200 gallons of "flammable liquid organic solvent" on or about July 31, 1979, which contained hazardous substances owned or possessed by FMC, at the LCCS Site.

197.    These types of waste streams from a company such as FMC can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, methylene chloride, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

198.    By letter dated November 20, 2015, the LCCS Group notified FMC of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered FMC the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

199.    To date, FMC has not paid its equitable share of LCCS Site response costs.

200.    Defendant GC Electronics ("GC Electronics") has a principal place of business at 1801 Morgan Street, Rockford, Illinois.

201.    GC Electronics is in the business of electronic device and component manufacturing.

202.    According to LCCS Site records, GC Electronics by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or

possessed by GC Electronics: 3,715 gallons of "flammable liquid, NOS" on or about February 17, 1982; and 715 gallons of "waste solvents" on or about September 3, 1982, totaling at least 4,430 gallons, at the LCCS Site.

203.    These types of waste streams from a company such as GC Electronics can contain hazardous materials such as acetone, copper, lead, methyl ethyl ketone, toluene, trichloroethane and/or xylenes.

204.    By letter dated November 20, 2015, the LCCS Group notified GC Electronics of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered GC Electronics the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

205.    To date, GC Electronics has not paid its equitable share of LCCS Site response costs.

206.    Defendant The Gillette Company ("Gillette") is the successor to The Parker Pen Company ("Parker Pen").

207.    In or about 1888, Parker Pen was formed as Delaware corporation.

208.    Parker Pen was in the business of luxury pen manufacturing.

209.    On or about January 3, 1950, Gillette was formed as Delaware corporation.

210.    In or about 1993, Parker Pen was acquired by Gillette.

211.    According to LCCS Site records, Parker Pen by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Parker Pen: 63 gallons of "waste oil/solvent" on or about May 15, 1981; 95 gallons of "waste

hydraulic oil" on or about May 15, 1981; 95 gallons of "waste ethanol/methyl chloride" on or about May 15, 1981; 95 gallons of "waste machine cleaning solvent" on or about May 15, 1981; 158 gallons of "waste drawing oil" on or about May 15, 1981; and 189 gallons of "waste cutting oil" on or about May 15, 1981, totaling at least 695 gallons, at the LCCS Site.

212. These types of waste streams from a company such as Parker Pen can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethanol, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

213. By letter dated November 20, 2015, the LCCS Group notified Newell Rubbermaid Inc. of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Newell Rubbermaid Inc. the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

214. Newell Rubbermaid Inc. forwarded the LCCS Group's November 20, 2015 demand letter and package to Gillette.

215. To date, Gillette has not paid its equitable share of LCCS Site response costs.

216. Defendant Greenfield Industries, Inc. ("Greenfield") is the successor to The Size Control Company ("Size Control").

217. Size Control was once a subsidiary of The Harbour Group ("Harbour").

218. Size Control had a principal place of business at 299 Bond Street, Elk Grove, Illinois.

219.    Size Control was in the business of tool manufacturing.

220.    On or about December 31, 1991, Greenfield Industries, Inc. ("Greenfield Industries") was formed as a Delaware corporation.

221.    Harbour acquired Greenfield Industries.

222.    Size Control was once a subsidiary of Greenfield Industries.

223.    Harbour merged Size Control into Greenfield Industries.

224.    Thereafter, Greenfield Industries continued to do business as Size Control.

225.    In or about 1997, Greenfield Industries was acquired by Kennametal, Inc. ("Kennametal").

226.    On or about May 11, 2007, the Illinois Secretary of State revoked Greenfield Industries.

227.    The last officer of record for Greenfield Industries was Carlos M. Cardoso with an address of 1600 Technology Way, Larobe, Pennsylvania.

228.    Carlos M. Cardoso is President and CEO of Kennametal.

229.    Kennametal's headquarters are located at 1600 Technology Way, Latrobe, Pennsylvania.

230.    On or about July 10, 2009, Greenfield was formed as an Illinois corporation.

231.    Greenfield was formed to be a successor to Greenfield Industries.

232.    Greenfield has a principal place of business at 2501 Davis Creek Road, Seneca, South Carolina.

233.    Greenfield is in the business of tool manufacturing.

234.    According to LCCS Site records, Size Control by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for

disposal or treatment, 29,205 gallons of waste, which contained hazardous substances owned or possessed by Size Control, at the LCCS Site.

235.    These types of waste streams from a company such as Size Control can contain hazardous materials such as chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene and/or xylenes.

236.    By letter dated March 14, 2016, the LCCS Group notified Greenfield of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Greenfield the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

237.    To date, Greenfield has not paid its equitable share of LCCS Site response costs.

238.    Defendant Hammond Suzuki USA, Inc. ("Hammond Suzuki") is the successor to Hammond Organ Company ("Hammond Organ").

239.    On or about April 28, 1967, Hammond Organ was formed as a Delaware corporation.

240.    Hammond Organ was in the business of manufacturing and distributing electric organs.

241.    Hammond Organ had a principal place of business at 4200 West Diversey Avenue, Chicago, Illinois.

242.    In or about 1989, Suzuki Musical Instrument Corporation ("Suzuki Musical Instrument Corp.") acquired the Hammond Organ name and assets.

243.    On or about April 9, 1990, Hammond Organ changed its name to Hamco of Illinois, Inc. ("Hamco").

244.    On or about July 3, 1991, the Illinois Secretary of State withdrew Hamco.

245.    The last officer of record for Hamco was Robert A. Pritzker with an address of 225 West Washington, Chicago, Illinois.

246.    On or about December 23, 1991, Hammond Suzuki was formed as a Delaware corporation.

247.    The officer of record for Hammond Suzuki is Manji Suzuki with a 2-25-11 Ryoke, Hammamatsu, Japan address.

248.    The domestic officer of record is Peter Nguyen.

249.    Hammond Suzuki was formed by Suzuki Musical Instrument Corp. to be the successor to Hammond Organ.

250.    Hammond Suzuki has a principal place of business at 743 West Annoreno Drive, Addison, Illinois.

251.    Hammond Suzuki is in the business of manufacturing and distributing electric organs.

252.    According to LCCS Site records, Hammond Organ by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 605 gallons of "flammable liquid" on or about May 5, 1982, which contained hazardous substances owned or possessed by Hammond Organ, at the LCCS Site.

253.    These types of waste streams from a company such as Hammond Organ can contain hazardous materials such as acetone, chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene and/or xylenes.

254.    By letter dated November 20, 2015, the LCCS Group notified Hammond Suzuki of the existence of the release or threatened release of hazardous substances at the LCCS Site,

and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Hammond Suzuki the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

255.    To date, Hammond Suzuki has not paid its equitable share of LCCS Site response costs.

256.    Defendant Interplastic Corp. ("Interplastic") has a principal place of business at 1225 Willow Lake Boulevard, St. Paul, Minnesota.

257.    Interplastic is in the business of producing and selling unsaturated polyester and vinyl ester resins, gel coats, putties and colorants for the composites and cast polymer industries.

258.    According to LCCS Site records, Interplastic by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 2,750 gallons of "resin" on or about August 6, 1979, which contained hazardous substances owned or possessed by Interplastic, at the LCCS Site.

259.    By letter dated November 20, 2015, the LCCS Group notified Interplastic of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Interplastic the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

260.    To date, Interplastic has not paid its equitable share of LCCS Site response costs.

261.    Defendant Jewell Instruments, LLC doing business as Triplett Test Equipment & Tools ("Jewell") is the successor to Triplett Corporation ("Triplett").

262.    In or about January 2007, Triplett was acquired by Jewell, which maintains the Triplett name for a product line.

41

263.     Jewell has a principal place of business at 850 Perimeter Road, Manchester,  New Hampshire.

264.     Triplett was in the business of manufacturing industrial testing equipment.

265.     According to LCCS Site records, Triplett by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Triplett: 440 gallons of "paint thinner & trichorethene [sic]," 165 gallons of "oil" and 165 gallons of "chlorothene" on or about December 11, 1981; and 165 gallons of "paint thinner & triclorethene [sic]" and 290 gallons of "oil" on or about September 10, 1982, totaling at least 1,225 gallons, at the LCCS Site.

266.     These types of waste streams from a company such as Triplett can contain hazardous materials such as acetone, chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene and/or xylenes.

267.     By letter dated November 20, 2015, the LCCS Group notified Jewell of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Jewell the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

268.     To date, Jewell has not paid its equitable share of LCCS Site response costs.

269.      Defendant Johnston & Chapman Inc. ("Johnston & Chapman") has a principal place of business at 128 North Merrill Street, Park Ridge, Illinois.

270.     Johnston & Chapman is in the business of metal stamping.

42

271.     According to LCCS Site records, Johnston & Chapman by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Johnston & Chapman: 55 gallons of "flammable liquid" on or about October 12, 1982; and 55 gallons of waste on or about October 12, 1982, totaling at least 110 gallons, at the LCCS Site.

272.     These types of waste streams from a company such as Johnston & Chapman can contain hazardous materials such as acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, methylene chloride, trichloroethane, trichloroethylene and/or zinc.

273.     By letter dated January 20, 2016, the LCCS Group notified Johnston & Chapman of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Johnston & Chapman the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

274.     To date, Johnston & Chapman has not paid its equitable share of LCCS Site response costs.

275.     Defendant Justrite Manufacturing Co., LLC ("Justrite") has a principal place of business at 3291 Dewitt Avenue, Mattoon, Illinois.

276.     Justrite is in the business of safety containment product manufacturing.

277.     According to LCCS Site records, Justrite by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Justrite: 250 gallons of "waste paint" on or about May 18, 1981; 275 gallons of "paint" on or

about June 19, 1981; 220 gallons of "waste paint" on or about September 15, 1981; 175 gallons of "waste paint" on or about November 30, 1981; 145 gallons of "waste paint" on or about January 18, 1982; 255 gallons of "waste paint" on or about May 6 18, 1982; 275 gallons of "waste paint" on or about July 25, 1982; and 220 gallons of "waste paint" on or about October 21, 1982, totaling at least 1,815 gallons, at the LCCS Site.

278. These types of waste streams from a company such as Justrite can contain hazardous materials such as acetone, benzene, cadmium, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

279. By letter dated November 20, 2015, the LCCS Group notified Justrite of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Justrite the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

280. To date, Justrite has not paid its equitable share of LCCS Site response costs.

281. Alternatively, Defendant Nofire Corp. ("Nofire") is formerly known as Justrite, and is responsible for the waste streams attributable to Justrite, as alleged in paragraph no. 300 above.

282. On or about May 10, 1994, Justrite changed its name to Nofire.

283. Nofire has a principal place of business at 520 Lane Cook Road, Suite 280, Deerfield, Illinois.

284. To date, Nofire has not paid its equitable share of LCCS Site response costs.

285. Defendant Kerr Corp. ("Kerr") has a principal place of business at 1717 West Collins Avenue, Orange, California.

286. Kerr is in the business of manufacturing and distributing dental supplies.

287. According to LCCS Site records, Kerr by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Kerr: 110 gallons of "mixed waste solvents, non chlorinated" and 165 gallons of "1.1.1. trichloroethane" on or about May 25, 1982; and 55 gallons of "1.1.1. trichloroethane" on or about October 11, 1982, totaling at least 330 gallons, at the LCCS Site.

288. These types of waste streams from a company such as Kerr can contain hazardous materials such as arsenic, cadmium, chromium, copper, lead, methyl ethyl ketone, methylene chloride, trichloroethane, trichloroethylene and/or zinc.

289. By letter dated November 20, 2015, the LCCS Group notified Kerr of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Kerr the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

290. To date, Kerr has not paid its equitable share of LCCS Site response costs.

291. Defendant Lenz Oil Service Peoria, Inc. ("Lenz Oil") has a principal place of business at 3001 South West Washington Street, Peoria, Illinois.

292. Lenz Oil once had a place of business located at Route 83 and Jeane Road, Lemont, Illinois.

293. Lenz Oil is in the business of transporting, recycling, and disposing of waste oil.

294. According to LCCS Site records, Lenz Oil by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Lenz Oil: 6,000 gallons of "solvents" on or about May 22, 1979; 42,000 gallons of "solvents" on or about May 23, 1979; 12,000 gallons of "solvent" on or about May 30, 1979; 6,000 gallons of "solvent" on or about June 5, 1979; 11,500 gallons of "solvent" on or about June 7, 1979; 5,100 gallons of "solvent" on or about June 11, 1979; 4,000 gallons of "solvent" on or about June 13, 1979; 4,000 gallons of "solvent" on or about June 14, 1979; 12,000 gallons of "solvents" on or about June 18, 1979; 4,500 gallons of "solvent" on or about June 20, 1979; 9,700 gallons of "solvent" on or about June 28, 1979; 5,200 gallons of "solvent" on or about July 10, 1979; 5,200 gallons of "solvent" on or about July 10, 1979; and 6,000 gallons of "solvents" on or about July 13, 1979, totaling at least 133,200 gallons, at the LCCS Site.

295. These types of waste streams from a company such as Lenz Oil can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc

296. By letter dated November 20, 2015, the LCCS Group notified Lenz Oil of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Lenz Oil the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

297.    To date, Lenz Oil has not paid its equitable share of LCCS Site response costs.

298.    Defendant OXY USA Inc. ("OXY USA") is formerly known as Cities Service Oil and Gas Corporation ("Cities Service").

299.    In or about August 1988, Cities Service changed its name to OXY USA.

300.    OXY USA has a principal place of business at 5 Greenway Plaza, Suite 110, Houston, Texas.

301.    OXY USA is in the business of exploration, production, and marketing of crude oil and natural gas.

302.    According to LCCS Site records, Cities Service by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Cities Service: 3,080 gallons of "waste grease" on or about July 11, 1979; and 1,055 gallons of "blue T lab solvent, flammable liquid, nos" on or about February 27, 1981; totaling at least 4,135 gallons at the LCCS Site.

303.    These types of waste streams from a company such as Cities Service can contain hazardous materials such as acetone, benzene, chromium, ethyl benzene, manganese, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

304.    By letter dated November 20, 2015, the LCCS Group notified OXY USA of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered OXY USA the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

305.    To date, OXY USA has not paid its equitable share of LCCS Site response costs.

306.    Defendant Paint & Coatings Ventures, Inc. ("Paint & Coatings") is the successor to Barrett Varnish Company ("Barrett Varnish").

307.    On or about November 16, 1912, Barrett Varnish was formed as an Illinois corporation.

308.    Barrett Varnish was in the business of paint and varnish manufacturing.

309.    Barrett Varnish had a principal place of business at 5050 West 16th Street, Chicago, Illinois, and an additional location at 1532 South 50th Court, Cicero, Illinois.

310.    On or about December 16, 1987, Multicolors Specialties, Inc. ("Multicolors") was formed as an Illinois corporation.

311.    On or about March 31, 1988, Multicolors changed its name to Multicolor Specialties, Inc. ("Multicolor").

312.    On or about September 30, 2002, Barrett Varnish was voluntarily dissolved by the Illinois Secretary of State.

313.    On or about June 6, 2011, Multicolor changed its name to Paint & Coatings.

314.    According to EPA, the 5050 West 16th Street, Chicago, Illinois property is associated with EPA identification number ILD094291648, which is assigned to Multicolor with alternative name Barrett Varnish.

315.    Additionally, according to EPA, the 1532 South 50th Court, Cicero, Illinois property is associated with Multicolor.

316.    Paint & Coatings has a principal place of business at 1532 South 50th Court, Cicero, Illinois.

317.    Paint & Coatings is in the business of paint and varnish manufacturing.

318.     According to LCCS Site records, Barrett Varnish by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Barrett Varnish: 4,180 gallons of "obsolete material (1-gal. sample)" on or about May 12, 1978; 1,320 gallons of "obsolete material" on or about May 22, 1978; 80 gallons of "5 gal. pails" on or about August 17, 1978; and 1,595 gallons of "aerosol cans" on or about August 17, 1978, totaling at least 7,175 gallons, at the LCCS Site.

319.     These types of waste streams from a company such as Barrett Varnish can contain hazardous materials such as acetone, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, toluene, trichloroethane, trichloroethylene and/or zinc

320.     By letter dated November 20, 2015, the LCCS Group notified Paint & Coatings of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Paint & Coatings the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

321.     To date, Paint & Coatings has not paid its equitable share of LCCS Site response costs.

322.     Defendant Parker-Hannifin Corp. ("Parker-Hannifin") has a principal place of business at 6035 Parkland Boulevard, Cleveland, Ohio.

323.     Parker-Hannifin is in the business of motion and control technologies.

324.     According to LCCS Site records, Parker-Hannifin by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for

disposal or treatment, 1,320 gallons of waste on or about October 17, 1978, which contained

hazardous substances owned or possessed by Parker-Hannifin, at the LCCS Site.

325.    These types of waste streams from a company such as Parker-Hannifin can

contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene,

benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene,

dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl

ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene,

trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

326.    By letter dated November 20, 2015, the LCCS Group notified Parker-Hannifin of

the existence of the release or threatened release of hazardous substances at the LCCS Site, and

that the LCCS Group intended to take steps to eliminate the release or threatened release of

hazardous substances at the LCCS Site, and offered Parker-Hannifin the opportunity to

voluntarily join in the LCCS Group's efforts at the LCCS Site.

327.    To date, Parker-Hannifin has not paid its equitable share of LCCS Site response

costs.

328.    Defendant Peter J. Bolt Scavenger Service, Inc. ("Bolt Scavenger") has a

principal place of business at 5819 West Ogden Avenue, Cicero, Illinois.

329.    Bolt Scavenger is in the business of junk removal and hauling.

330.    According to LCCS Site records, Bolt Scavenger accepted for transport to the

LCCS Site, which was selected by Bolt Scavenger, 1,870 gallons of "waste printing ink &

solvent oils and waste rags" on or about June 9, 1981 which contained hazardous substances, at

the LCCS Site.

331. The waste streams transported by Bolt Scavenger can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

332. The waste streams Bolt Scavenger transported to the LCCS Site were generated by Alco Gravure, Inc.

333. By letter dated November 20, 2015, the LCCS Group notified Bolt Scavenger of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Bolt Scavenger the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

334. To date, Bolt Scavenger has not paid its equitable share of LCCS Site response costs.

335. Defendant Plastomer Corp. ("Plastomer") has a principal place of business at 37819 Schoolcraft Road, Livonia, Michigan.

336. Plastomer is in the business of industrial foam engineering.

337. According to LCCS Site records, Plastomer by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Plastomer: 385 gallons of "waste chlorinated solvent N.O.S" on or about July 22, 1982; and

165 gallons of "waste isocydnate (TDI)" on or about July 22, 1982, totaling at least 550 gallons, at the LCCS Site.

338.    These types of waste streams from a company such as Plastomer can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

339.    By letter dated November 20, 2015, the LCCS Group notified Plastomer of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Plastomer the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

340.    To date, Plastomer has not paid its equitable share of LCCS Site response costs.

341.    Defendant Replogle Globes Partners LLC ("Replogle") has a principal place of business at 4719 West 62nd Street, Indianapolis, Indiana.

342.    Replogle is in the business of manufacturing commercial globes.

343.    According to LCCS Site records, Replogle by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 12,045 gallons of "lacquer sludge" on or about May 27, 1980, which contained hazardous substances owned or possessed by Replogle, at the LCCS Site.

344.    These types of waste streams from a company such as Replogle can contain hazardous materials such as acetone, chromium, copper, lead, methanol, methyl ethyl ketone, toluene and/or xylenes.

345.    By letter dated November 20, 2015, the LCCS Group notified Replogle of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Replogle the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

346.    To date, Replogle has not paid its equitable share of LCCS Site response costs.

347.    Defendant Riverside Mfg., LLC ("Riverside LLC") is the successor to Riverside Mfg., Inc. ("Riverside, Inc.").

348.    On or about November 14, 1967, Lehigh Harness, Inc. ("Lehigh Harness") was formed as a Michigan corporation.

349.    On or about January 26, 1968, Lehigh Harness changed its name to Riverside Manufacturing Industries, Inc. ("Riverside Industries").

350.    On or about January 30, 1975, Riverside Industries changed its name to Riverside, Inc.

351.    Riverside, Inc. had a principal place of business at 601 Abbott Road, East Lansing, Michigan.

352.    Riverside, Inc. was in the business of industrial tool and die manufacturing.

353.    On or about April 22, 1991, E&R Products, Ltd. ("E&R") was formed as an Indiana corporation.

354.    On or about March 13, 1992, Riverside, Inc. was merged with and into E&R.

355. Harold R. Barr was the President of both Riverside, Inc. and E&R.

356. On or about December 14, 1992, E&R changed its name to Riverside Mfg. Inc. ("Riverside Inc.").

357. In or about 2002, Fred J. Merritt acquired sole interest of Riverside Inc.

358. Riverside Inc. has a principal place of business at 14150 Lima Road, Ford Bend, Indiana, with President Fred J. Merritt.

359. On or about June 1, 2007, Riverside LLC was formed as an Indiana corporation, and primarily operating in Fort Wayne, Indiana.

360. Riverside LLC is also known as Riverside Inc.

361. Riverside LLC has a principal place of business at 14150 Lima Road, Ford Bend, Indiana, with President Fred J. Merritt.

362. Riverside LLC is in the business of industrial tool and die manufacturing.

363. According to LCCS Site records, Riverside, Inc. by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Riverside Manufacturing, Inc.: 1,200 gallons of "cyclohexanone" on or about September 8, 1982; 670 gallons of "tetrahydroluran" on or about September 8, 1982; and 275 gallons of "cyclohexanone tetrahydrol uran mix" or about September 8, 1982, totaling at least 2,145 gallons, at the LCCS Site.

364. By letter dated November 20, 2015, the LCCS Group notified Riverside LLC of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of

hazardous substances at the LCCS Site, and offered Riverside LLC the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

365. To date, Riverside LLC has not paid its equitable share of LCCS Site response costs

366. Defendant Romo, Inc. doing business as Romo Durable Graphics ("Romo") is the successor to Chicago Decal Co. ("Chicago Decal").

367. On or about February 14, 1961, Chicago Decal was filed as a foreign corporation with the Illinois Secretary of State.

368. On or about August 3, 2010, Chicago Decal amended its name to CFCL Decal, Inc. ("CFCL Decal").

369. On or about November 28, 1956, Romo Display Advertising, Incorporated ("Romo Display") was formed as a Wisconsin corporation.

370. On or about June 7, 1972, Romo Display amended its name to Romo.

371. In or about 2011, CFCL Decal was bought and merged into Romo.

372. On or about October 13, 2011, CFCL Decal was withdrawn by the Illinois Secretary of State.

373. CFCL Decal formerly known as Chicago Decal had a principal place of business at 3310 Elston Avenue, Chicago, Illinois.

374. CFCL Decal formerly known as Chicago Decal was in the business of graphics printing.

375. Romo has a principal place of business at 800 Heritage Road, De Pere, Wisconsin.

376. Romo is in the business of graphics printing.

377.    According to LCCS Site records, Chicago Decal by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 990 gallons of "waste matl form laminator" on or about December 19, 1978, which contained hazardous substances owned or possessed by Chicago Decal, at the LCCS Site.

378.    These types of waste streams from a company such as Chicago Decal can contain hazardous materials such as acetone, barium, copper, methyl ethyl ketone, toluene, trichloroethane, trichloroethylene, xylenes and/or zinc.

379.    By letter dated November 20, 2015, the LCCS Group notified Romo of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site; and offered Romo the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

380.    To date, Romo has not paid its equitable share of LCCS Site response costs.

381.    Defendant Royal Adhesives and Sealants, LLC ("Royal Adhesives") is the successor to St. Clair Rubber Company ("St. Clair Rubber").

382.    On or about April 4, 1921, St. Clair Rubber was formed as a Michigan corporation.

383.    St. Clair Rubber was in the business of commercial rubber manufacturing.

384.    On or about June 1, 1966, Canadian Amusement Company ("Canadian Amusement Co.") was formed as a Michigan corporation.

385.    On or about July 22, 1982, Canadian Amusement Co. amended its name to Evans-St. Clair, Inc. ("Evans-St. Clair").

386.    On or about August 3, 1982, St. Clair Rubber and Evans-St. Clair entered into an agreement by which Evans-St. Clair acquired the assets of St. Clair Rubber.

387.    On or about March 18, 1983, St. Clair Rubber's term expired with the Michigan Secretary of State.

388.    On or about March 6, 1987, Evans Industries, Inc. ("Evans Industries") was filed as a foreign corporation with the Michigan Secretary of State, whose last address of record is 200 Renaissance Center, Suite 3150, Detroit, Michigan.

389.    On or about June 14, 1988, NuSub IV, Inc. ("NuSub") was formed as a Michigan corporation.

390.    On or about December 4, 2001, NuSub amended its name to ESC Adhesives, Inc. ("ESC Adhesives").

391.    On or about November 20, 2003, Evan-St. Clair filed an annual report with the Michigan Secretary of State, indicating its President was Robert B. Evans, Jr., at 200 Renaissance Center, Suite 3150, Detroit, Michigan, and it was in the business of rubber manufacturing.

392.    On or about November 19, 2004, Royal Adhesives acquired certain assets of "Evans Industries, Inc. doing business as ESC Adhesives Inc.," whose address was 200 Renaissance Center, Detroit, Michigan.

393.    On or about December 21, 2005, Evans-St. Clair was dissolved by the Michigan Secretary of State.

394.    On or about May 9, 2006, ESC Adhesives filed an annual report with the Michigan Secretary of State, indicating its President was Robert B. Evans, at 200 Renaissance Center, Suite 3150, Detroit, Michigan, and it was in the business of adhesive manufacturing.

395.     ESC Adhesives was formerly known as and/or also known as Evans-St. Clair.

396.     Royal Adhesives has a principal place of business at 2001 West Washington Street, South Bend, Indiana.

397.     Royal Adhesives is in the business of commercial adhesive and sealant manufacturing.

398.     According to LCCS Site records, St. Clair Rubber by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 660 gallons of "liquid adhesive" on or about February 27, 1979, which contained hazardous substances owned or possessed by St. Clair Rubber, at the LCCS Site.

399.     These types of waste streams from a company such as St. Clair Rubber can contain hazardous materials such as arsenic, cadmium, chromium, copper, lead, mercury, methyl ethyl ketone, methylene chloride, trichloroethane, trichloroethylene and/or zinc.

400.     By letter dated November 20, 2015, the LCCS Group notified Royal Adhesives of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Royal Adhesives the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

401.     To date, Royal Adhesives has not paid its equitable share of LCCS Site response costs.

402.     Defendant Si-Tech Industries Inc. ("Si-Tech") is the successor to Reliable Liquid Control Corp. ("Reliable Liquid").

403.     On or about March 25, 1975, Reliable Liquid was formed as an Illinois corporation.

404. Reliable Liquid had a principal place of business at 7700 West 88th Street, Bridgeview, Illinois.

405. Reliable Liquid was in the business of liquid waste hauling.

406. On or about August 28, 1990, Si-Tech was filed as a foreign corporation with the Illinois Secretary of State.

407. On or about August 1, 1992, Reliable Liquid was involuntary dissolved by the Illinois Secretary of State.

408. The last known officer of record for Reliable Liquid was President Fred J. Sykora with an address of 10647 South St. Louis Street, Chicago, Illinois.

409. The last known officers of record for Si-Tech are as follows: President Michael J. Sykora, with an address of 17202 South 70th Avenue, Tinley Park, Illinois; and Secretary Cerald T. Slattery, with an address of 10844 South Maplewood, Chicago, Illinois.

410. In or about 2001, the 7700 West 88th Street, Bridgeview, Illinois property was sold to the Village of Bridgeview, Illinois, with the warranty deed signed by Michael J. Sykora.

411. According to EPA, the 7700 West 88th Street, Bridgeview, Illinois property is associated with EPA identification number ILD089064745, which is assigned to Si-Tech.

412. Additionally, EPA also assigned EPA identification number ILD089064745 to Reliable Liquid also at the 7700 West 88th Street, Bridgeview, Illinois property, with regulatory contact Michael Sykora.

413. Si-Tech has a principal place of business at 12057 South Page Street, Calumet Park, Illinois.

414. Si-Tech is in the business of liquid waste hauling.

415.    According to LCCS Site records, Reliable Liquid by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Reliable Liquid: 4,000 gallons of "waste caustic water" on or about June 29, 1979; 2,500 gallons of "water" on or about June 29, 1979; 2,500 gallons of "caustic waste water" on or about July 2, 1979; 4,300 gallons of "waste water" on or about July 30, 1979; 4,100 gallons of "water and oil" on or about August 6, 1979; 8,400 gallons of "waste water" on or about August 10, 1979; 4,100 of "waste oil & water" on or about August 10, 1979; 2,300 gallons of "paint waste" on or about August 10, 1979; 4,100 gallons of "oil & water waste" on or about August 8, 1979; 4,100 gallons of "water & oil" on or about August 10, 1979; 8,500 gallons of "waste water" on or about August 15, 1979; 4,100 gallons of "water/oil" on or about August 17, 1979; 11,000 gallons of "waste water" on or about August 22, 1979; 3,500 gallons of "waste water & oil" on or about August 22, 1979; 4,100 gallons of "water & oil" on or about August 22, 1979; 11,000 gallons of "stamping collant [sic] water" on or about August 24, 1979; 5,500 gallons of "stamping coolant water" on or about August 25, 1979; 2,000 gallons of "waste water" on or about August 25, 1979; and 2,500 gallons of "machinery cleaner rinse water" on or about October 2, 1979, totaling at least 92,600 gallons, at the LCCS Site.

416.    These types of waste streams from a company such as Reliable Liquid can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

417.    Additionally, Si-Tech is the successor to Reliable Oil Co. ("Reliable Oil").

418.    On or about January 1, 1980, Reliable Oil was formed as an Illinois corporation.

419.    Reliable Oil had a principal place of business at 10647 South St. Louis, Chicago, Illinois.

420.    Reliable Oil was in the business of liquid waste hauling.

421.    On or about August 28, 1990, Si-Tech was filed as a foreign corporation with the Illinois Secretary of State.

422.    On or about May 16, 1996, Reliable Oil was dissolved by the Illinois Secretary of State.

423.    The last officers of record for Reliable Oil were President Fred J. Sykora and Secretary Michael J. Sykora.

424.    The last known officers of record for Si-Tech are as follows: President Michael J. Sykora, with an address of 17202 South 70th Avenue, Tinley Park, Illinois; and Secretary Cerald T. Slattery, with an address of 10844 South Maplewood, Chicago, Illinois.

425.    According to LCCS Site records, Reliable Oil by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Reliable Oil: 1,500 gallons of waste on or about August 9, 1978; 1,500 gallons of waste on or about August 22, 1978; and 1,500 gallons of waste on or about October 3, 1978, totaling at least 4,500 gallons, at the LCCS Site.

426.    These types of waste streams from a company such as Reliable Oil can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl

benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

427.    By letter dated November 20, 2015, the LCCS Group notified Si-Tech of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Si-Tech the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

428.    To date, Si-Tech has not paid its equitable share of LCCS Site response costs.

429.    Defendant Steve Gregory Landscaping and Snowplowing, Inc. ("Gregory Landscaping") has a principal place of business at 2704 Killarney, Cary, Illinois.

430.    Gregory Landscaping is in the business of landscape contracting.

431.    According to LCCS Site records, Gregory Landscaping by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Gregory Landscaping: 1,320 gallons of waste on or about July 20, 1978; 2,640 gallons of waste on or about July 24, 1978; 825 gallons of waste on or about July 31, 1978; 1,065 gallons of waste on or about August 22, 1978; 1,650 gallons of waste on or about August 25, 1978; 1,650 gallons of waste on or about September 19, 1978; 932 gallons of waste on or about September 22, 1978; 1,200 gallons of waste on or about December 4, 1978; 1,650 gallons of waste on or about December 21, 1978; 1,780 gallons of waste on or about February 26, 1979; 885 gallons of waste on or about February 28, 1979; 3,425 gallons of waste on or about March 27, 1979; 825 gallons of waste on or about March 28, 1979; 4,840 gallons of waste on or about

June 11, 1979; 1,760 gallons of waste on or about August 6, 1979; 2,714 gallons of waste on or about September 10, 1979; 825 gallons of waste on or about September 12, 1979; 1,100 gallons of waste on or about October 1, 1979; 1,100 gallons of "paint booth solvents" and 1,100 gallons of "paint booth solvents, solid drums" on or about October 3, 1979; 1,100 gallons of "solid drums," 1,100 gallons of "solid drums, drums no good" and 1,100 gallons of waste on or about October 24, 1979; 50 gallons of waste on or about November 5, 1979; 1,155 gallons of "water & glue" and 50 gallons of "water 7 glue" on or about November 9, 1979; and 2,310 gallons of "water & glue" and 1,155 gallons of waste on or about November 12, 1979, totaling at least 41,306 gallons, at the LCCS Site.

432. These types of waste streams from a company such as Gregory Landscaping can contain hazardous materials such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene, dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

433. According to LCCS Site records, Gregory Landscaping accepted for transport to the LCCS Site, which was selected by Gregory Landscaping, the following amounts of waste containing hazardous substances: 440 gallons of "lacquer thinner" on or about August 17, 1981; 825 gallons of "waste oil solvent, flammable" on or about October 1, 1981; and 990 gallons of "waste oil solvent, flammable liquid," totaling at least 2,255 gallons.

434. The waste streams transported by Gregory Landscaping likely contained some or all of the following hazardous substances such as acetone, arsenic, barium, benzo(a)anthracene, benzo(a)pyrene, benzene, cadmium, chromium, cresol, cobalt, copper, dichlorobenzene,

dichloroethylene, ethyl benzene, fluorene, lead, manganese, mercury, methylene chloride, methyl ethyl ketone, molybdenum, nickel, perchloroethylene, phenanthrene, selenium, tin, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylenes and/or zinc.

435. The waste streams Gregory Landscaping transported to the LCCS Site were generated by CAI Recon Optical and General Paint & Chemical.

436. By letter dated November 20, 2015, the LCCS Group notified Gregory Landscaping of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Gregory Landscaping the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

437. To date, Gregory Landscaping has not paid its equitable share of LCCS Site response costs.

438. Defendant United States Department of Energy ("DOE") has a principal place of business at 1000 Independence Avenue Southwest, Washington, District of Columbia.

439. DOE is a federal governmental entity.

440. According to LCCS Site records, DOE by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by DOE: 4,345 gallons of "hazardous waste liquid n.o.s." on or about January 7, 1982; 4,345 gallons of "hazardous waste liquid n.o.s." on or about January 13, 1982; and 7,720 gallons of "hazardous waste liquid n.o.s." on or about January 15, 1982, totaling at least 16,410 gallons, at the LCCS Site.

441. These types of waste streams from a entity such as DOE can contain hazardous materials such as acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

442. Additionally, DOE was the owner and/or operator of the Morgantown Energy Research Center.

443. According to LCCS Site records, Morgantown Energy Research Center by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, 270 gallons of "watery" on or about March 12, 1982, which contained hazardous substances owned or possessed by Morgantown Energy Research Center, at the LCCS Site.

444. By letter dated November 20, 2015, the LCCS Group notified DOE of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered DOE the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

445. To date, DOE has not paid its equitable share of LCCS Site response costs.

446. Defendant United Steel & Wire Company ("United Steel & Wire") has a principal place of business at 409 Wayne Road, Battle Creek, Michigan.

447. United Steel & Wire is in the business of manufacturing and selling shopping carts and merchandising displays for supermarket and retail industries.

448. According to LCCS Site records, United Steel & Wire by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for

disposal or treatment, 440 gallons of waste, which contained hazardous substances owned or possessed by United Steel & Wire, at the LCCS Site.

449.     These types of waste streams from a company such as United Steel & Wire can contain hazardous materials such as acetone, chromium, copper, lead, manganese, methyl ethyl ketone, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene and/or xylenes.

450.     By letter dated March 14, 2016, the LCCS Group notified United Steel & Wire of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered United Steel & Wire the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

451.     To date, United Steel & Wire has not paid its equitable share of LCCS Site response costs.

452.     Defendant Valley City Disposal, Inc. ("Valley City Disposal") has a principal place of business at 1040 Market Avenue Southwest, Grand Rapids, Michigan.

453.     Valley City Disposal is in the business of hazardous and non-hazardous waste transportation and disposal, technical field services and electronics recycling.

454.     According to LCCS Site records, Valley City Disposal accepted for transport to the LCCS Site, which was selected by Valley City Disposal, the following amounts of waste containing hazardous substances: 385 gallons of "toluene diisocyanate & methylene chloride" and 220 gallons of "polyether resin" on or about January 21, 1982; 165 gallons of "trichloroethylene" and 1,500 gallons of "diphenyl methane diisocyanate" on or about April 7, 1982; 1,650 gallons of "diphenyl methane diisocyanate," 220 gallons of "resin solution" and 220 gallons of "resin solution - (contaminated w/cutting oil)" on or about April 15, 1982; 605 gallons

of "waste paint," 220 gallons of "waste toluene," 275 gallons of "waste cement liq. nos," 440 gallons of "waste methylene chloride" and 55 gallons of "waste solvent, n.o.s." on or about May 18, 1982; 165 gallons of "hazardous waste, liquid, n.o.s. (polyether resin & trichloromonofluoromethane mixture)" and 165 gallons of "waste toluene diisocyanate" on or about July 8, 1982; 165 gallons of "poly. resin & trichloromonofluoromethane" on or about July 9, 1982; 3,960 gallons of "waste compound paint thinner" on or about July 21, 1982; 4,070 gallons of "waste compound paint thinner" on or about July 28, 1982; 330 gallons of "(mixed solvents) hazardous waste liquid N.O.S." on or about August 25, 1982; 165 gallons of "trichloroethylene" on or about August 26, 1982; 275 gallons of "waste cement, liquid, n.o.s.," 750 gallons of "waste cement liquid, n.o.s.," 40 gallons of "waste paint remover" and 880 gallons of "waste paint" on or about August 27, 1982; 4,500 gallons of "combustible liquid, nos (waste detergent surfactant/labeled T-B)" on or about September 3, 1982; 165 gallons of "methylene chloride solution" and 165 gallons of "collodion" on or about September 8, 1982; 1,595 gallons of "waste paint thinning compound" on or about September 9, 1982; 275 gallons of "waste cement, liquid, n.o.s." and 550 gallons of "waste methylene chloride" on or about September 13, 1982; 550 gallons of "waste paint remover," 935 gallons of "waste paint thinning compound," 800 gallons of "waste liquid paint," 500 gallons of "waste cement" and 50 gallons of "waste xylol" on or about September 22, 1982; 605 gallons of "waste methylene chloride," 275 gallons of "waste (TDI) toluene diisocyanate" and 330 gallons of "waste oil n.o.s." on or about October 5, 1982; and 495 gallons of "waste cement, liquid, n.o.s.," 165 gallons of "waste corrosive liquid, nos" and 385 gallons of "waste paint" on or about October 15, 1982, totaling at least 29,260 gallons.

455. The waste streams Valley City Disposal transported to the LCCS Site were generated by Belding Products; C-Tek, Evans Products Company; Grand Rapids Manufacturing Company; Keeler Brass Company; LSI-Rapistan; Mid West Components; Muskegon Chemical Company; PMI Laboratories, Inc.; Steelcase Inc.; Teledyne Continental Motors; Leon Plastics Division/U.S. Industries, Inc.; Westinghouse Electric Corporation; and Whirlpool Corporation.

456. By letter dated November 20, 2015, the LCCS Group notified Valley City Disposal of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Valley City Disposal the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

457. To date, Valley City Disposal has not paid its equitable share of LCCS Site response costs.

458. Defendant Vanderhyden Septic Service Co. ("Vanderhyden Septic") has a principal place of business at 18340 Le Claire Avenue, Tinley Park, Illinois.

459. Vanderhyden Septic is in the business of residential and commercial septic tank cleaning and pumping.

460. According to LCCS Site records, Vanderhyden Septic accepted for transport to the LCCS Site, which was selected by Vanderhyden Septic, the following amounts of waste containing hazardous substances: 880 gallons of "0.2 water" on or about October 20, 1980; 1,925 gallons of "0.0 water" on or about October 21, 1980; 1,925 gallons of "10.40 water" on or about October 22, 1980; 1,925 gallons of "37.6 water" on or about October 27, 1980; 2,550 "gallons" on or about November 26, 1980; 1,000 "gallons" on or about December 3, 1980; 6,000 gallons of "paint waste and solvents" on or about January 5, 1981; 2,100 gallons of "paint waste and

solvents" on or about January 16, 1981; 3,000 gallons of "mixed waste solvents & adhesives, cement NOS" on or about January 29, 1981; 750 gallons of "adhesive solvents" on or about February 25, 1981; 2,650 gallons of "paint waste and solvents" on or about March 12, 1981; 3,000 gallons of "mixed waste solvents & adhesives, cement NOS" on or about March 31, 1981; 3,000 gallons of "paint waste and solvents" on or about April 7, 1981; 3,000 gallons of "paint waste and solvents" on or about April 8, 1981; 6,000 gallons of "paint waste and solvents" on or about June 3, 1981; 3,000 gallons of "paint waste and solvents" on or about June 4, 1981; 3,000 gallons of "paint waste and solvents" on or about June 5, 1981; 3,000 gallons of "mixed solvents and adhesive" on or about June 24, 1981; 1,500 gallons of "adhesive solvents" on or about June 25, 1981; 2,500 gallons of "paint waste and solvents" on or about June 29, 1981; 3,000 gallons of "paint waste and solvents" on or about July 6, 1981; 3,000 gallons of "paint waste and solvents" on or about July 28, 1981; 3,000 gallons of "adhesive solvents" on or about July 30, 1981; 3,000 gallons of "paint waste and solvents" on or about August 10, 1981; 3,000 gallons of "paint waste and solvents" on or about August 11, 1981; 3,000 gallons of "mixed waste solvents & adhesives, waste resin solution, contains toluene" on or about August 17, 1981; 3,000 gallons of "paint waste and solvents" on or about August 19, 1981; 3,000 gallons of "mixed solvents, flammable liquid" on or about August 26, 1981; 1,800 gallons of "adhesive solvents" on or about August 27, 1981; 3,000 gallons of "water, solvent & paint" on or about September 1, 1981; 3,000 gallons of "water, solvent & paint" on or about September 2, 1981; 2,000 gallons of "water-oil, grease" on or about September 4, 1981; 3,000 gallons of "paint waste and solvents" on or about September 9, 1981; 3,000 gallons of "solvents, flammable liquid" on or about September 10, 1981; 3,000 gallons of "solvent" on or about September 11, 1981; 300 gallons of "caustic soda" on or about September 16, 1981; 3,000 gallons of "paint

waste and solvents" on or about October 8, 1981; 990 gallons of "cyclohexnol-flammable liquid" on or about October 9, 1981; 3,000 gallons of "waste resin solution contains toluene" on or about October 13, 1981; 275 gallons of "solvents, NOS flammable liquid" on or about October 21, 1981; 3,000 gallons of "paint waste and solvents" on or about October 27, 1981; 3,000 gallons of "mixed waste solvents & adhesives, waste flammable liquid NOS" on or about November 9, 1981; 3,000 gallons of "mixed waste solvents & adhesives, waste resin solution" on or about November 18, 1981; 2,500 gallons of "solvents" on or about November 20, 1981; 3,000 gallons of "paint waste and solvents" on or about December 17, 1981; 3,000 gallons of "waste adhesive NOS" on or about December 29, 1981; 3,000 gallons of "paint waste and solvents" on or about January 25, 1982; 2,120 gallons of "adhesive solvents" on or about February 17, 1982; 3,000 gallons of "waste cement liquid NOS" on or about February 12, 1982; 3,000 gallons of "waste cement liquid NOS" on or about February 22, 1982; 3,000 gallons of "paint waste and solvents" on or about March 16, 1982; 3,000 gallons of "paint waste and solvents" on or about March 18, 1982; 3,000 gallons of "mixed waste solvents & adhesives, waste flammable liquid NOS" on or about March 29, 1982; 3,000 gallons of "paint waste and solvents" and 3,000 gallons of "waste adhesive NOS" on or about March 31, 1982; 3,000 gallons of "mixed waste solvents & adhesives, waste flammable liquid NOS" on or about April 1, 1982; 3,000 gallons of "paint waste and solvents" on or about April 16, 1982; 3,000 gallons of "paint waste and solvents" and 2,750 gallons of "flammable liquid N.O.S." on or about May 4, 1982; 2,751 gallons of "methyl ethyl ketone" and 2,750 gallons of "flammable liquid N.O.S." on or about May 5, 1982; 1,375 gallons of "flammable liquid" on or about May 6, 1982; 1,430 gallons of "flammable liquid" on or about May 12, 1982; 1,250 gallons of "waste solvent, flammable liquid N.O.S." on or about May 14, 1982; 1,980 gallons of "waste solvent, flammable liquid N.O.S." on or about May 15,

1982; 1,980 gallons of "waste solvent, flammable liquid N.O.S." on or about May 18, 1982;

1,980 gallons of "waste solvent, flammable liquid" on or about May 20, 1982; 3,000 gallons of

"paint waste and solvents" on or about May 21, 1982; 3,600 gallons of "mixed waste solvents &

adhesives, waste flammable liquid NOS" on or about May 26, 1982; 350 gallons of "mixed

waste solvent" on or about May 27, 1982; 5,000 gallons of "mixed solvents" on or about June 1,

1982; 300 gallons of "caustic soda, sodium hydroxide solution" on or about June 6, 1982; 3,000

gallons of "paint waste and solvents" on or about June 15, 1982; 3,000 gallons of "paint waste

and solvents" on or about June 18, 1982; 4,730 gallons of "paint waste and solvents" on or about

June 21, 1982; 2,000 gallons of "paint waste and solvents" on or about June 30, 1982; 3,000

gallons of "paint waste and solvents" on or about July 19, 1982; 3,000 gallons of "paint waste

and solvents" on or about July 20, 1982; 3,000 gallons of "paint waste and solvents" and 3,000

gallons of "waste adhesive NOS" on or about July 21, 1982; 4,700 gallons of "paint waste and

solvents" on or about July 26, 1982; 3,000 gallons of "waste adhesive NOS" on or about July 30,

1982; 8,000 gallons of "paint waste and solvents" and 4,000 gallons of "waste adhesive NOS" on

or about August 3, 1982; 305 gallons of "thinner, flammable liquid NOS" on or about August 16,

1982; 4,000 gallons of "paint waste and solvents" on or about August 18, 1982; 935 gallons of

"alcohol & water, waste" on or about August 19, 1982; 1,000 gallons of "flammable liquid

N.O.S." on or about August 20, 1982; 2,255 gallons of "adhesive - solvent" on or about August

23, 1982; 2,500 gallons of "paint waste and solvents" on or about August 24, 1982; 1,430 gallons

of "solid waste (solvent)" on or about September 2, 1982; 1,170 gallons of "flammable liquid

NOS" on or about September 3, 1982; 3,000 gallons of "paint waste and solvents" on or about

September 10, 1982; 330 gallons of "Flammable Liquid, N.O.S." on or about September 15,

1982; 150 gallons of "spent flux & thinner" and 11,200 gallons of "spent bath oil" on or about

September 16, 1982; 3,000 gallons of "waste adhesive NOS" on or about September 21, 1982; 440 gallons of "waste ink water sludge" and 440 gallons "solvent solid & liquid, ink nos" on or about September 28, 1982; 4,350 gallons of "paint waste and solvents" on or about October 1, 1982; 1,000 gallons of "waste solvents, flammable liq., N.O.S." on or about October 7, 1982; 990 gallons of "alcohol & water, waste" and 500 gallons of "flammable liq., N.O.S." on or about October 8, 1982; and 2,035 gallons of "waste solvent & adhesives" on or about October 12, 1982, totaling at least 271,646 gallons.

461.    The waste streams transported by Vanderhyden Septic likely contained some or all of the following hazardous substances such as acetone, cadmium, chromium, copper, dichloroethylene, lead, methyl ethyl ketone, methylene chloride, nickel, toluene, trichloroethane, trichloroethylene and/or zinc.

462.    The waste streams Vanderhyden Septic transported to the LCCS Site were generated by Avon Products, Inc.; Cal Park Auto Parts, Inc.; Daubert Chemical Company, Inc.; Durabond Products (USG Ind. Inc.); Duro Art Industries; Engineered Coated Products, Inc.; Defendant Federal Signal Corp.; Ford Motor Company; International Harvester; Mead Packaging; Midwest Aniline Printers, Inc.; Morton Chemical; Mystik Corporation; Nagel Pump; Pyle National Company; Signode Corporation; Union Carbide; and Weldon Industries, Inc.

463.    By letter dated November 20, 2015, the LCCS Group notified Vanderhyden Septic of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Vanderhyden Septic the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

464. To date, Vanderhyden Septic has not paid its equitable share of LCCS Site response costs.

465. Defendant Veolia ES Industrial Services, Inc. ("Veolia") is the successor to Correct Maintenance Corp. ("CMC").

466. CMC was in the business of chemical and waste transportation.

467. In or about January 1995, CMC was merged into Onyx Precision Services, Inc. ("Onyx Precision").

468. In or about June 2003, Onyx Precision was merged into Veolia.

469. Veolia has a principal place of business at 4760 World Houston Parkway, Suite 100, Houston, Texas.

470. Veolia is in the business of providing environmental services.

471. According to LCCS Site records, CMC accepted for transport to the LCCS Site, and/or by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment of waste owned or possessed by CMC: 3,080 "gallons" on or about May 17, 1978; 2,970 "gallons" on or about July 3, 1978; 1,980 gallons of "fire material" on or about October 20, 1978; 3,080 "gallons" on or about October 27, 1978; 5,000 "gallons" on or about December 18, 1978; 4,800 gallons of "caustic water" on or about June 4, 1979; 1,500 gallons of "wash/water" on or about June 8, 1979; 4,000 gallons of "molasses & wash water" on or about June 12, 1979; 2,522 gallons of "wash/water" on or about June 15, 1979; 3,000 gallons of "wash water" and 3,000 gallons of "waste caustic water" on or about July 6, 1979; 3,000 gallons of "waste water" on or about July 10, 1979; 3,080 gallons of "waste grease" on or about July 11, 1979; 2,500 gallons of "flammable waste" on or about July 26, 1979; 3,000 gallons of "dirty rinse water" on or about July 27, 1979; 3,000 gallons of "dirty

water" and 5,500 gallons of "waste water" on or about July 31, 1979; 6,760 gallons of "flammable waste" on or about August 3, 1979; 1,500 gallons of "combustible material" on or about August 14, 1979; 3,300 "gallons" on or about August 20, 1979; 8,000 gallons of "flam. material" on or about August 29, 1979; 4,800 gallons of "rinse water" on or about September 20, 1979; 2,000 gallons of "waste water" on or about November 19, 1979; 2,500 gallons of "waste water & soap" on or about November 23, 1979; 4,950 "gallons" on or about September 25, 1980; 3,000 gallons of "vinyl acetate – butyl, acrylate, and water, waste solvent" on or about February 21, 1982; and 3,500 gallons of "vinyl acetate – butyl, acrylate, and water, waste solvent" on or about February 25, 1982, totaling at least 95,322 gallons, at the LCCS Site.

472.    These types of waste streams generated and/or transported by CMC can contain hazardous materials such as acetone, benzene, chromium, ethyl benzene, manganese, methyl ethyl ketone, nickel, toluene, trichloroethane, xylenes and/or zinc.

473.    The waste streams CMC transported to the LCCS Site were generated by Ashland Chemical Co.; Cities Service Oil Company; Desoto, Inc.; and Rapco Foam.

474.    By letter dated November 20, 2015, the LCCS Group notified Veolia of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Veolia the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

475.    To date, Veolia has not paid its equitable share of LCCS Site response costs.

476.    Defendant Wilson Sporting Goods Co. ("Wilson") has a principal place of business at 8750 West Bryn Mawr Avenue, Chicago, Illinois.

477.    Wilson is in the business of manufacturing ball sports equipment.

478. According to LCCS Site records, Wilson by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, the following amounts of waste containing hazardous substances owned or possessed by Wilson: 2,860 "gallons" on or about March 28, 1978; 3,025 "gallons" on or about July 18, 1978; and 950 gallons of "waste solvents, flammable" and 2,600 gallons of "waste cutting oil" on or about February 19, 1982, totaling at least 9,435 gallons, at the LCCS Site.

479. These types of waste streams from a company such as Wilson can contain hazardous materials such as acetone, arsenic, cadmium, chromium, copper, formaldehyde, lead, mercury, methanol, methyl ethyl ketone, methylene chloride, selenium, silver, toluene, trichloroethane trichloroethylene, xylenes and/or zinc.

480. By letter dated November 20, 2015, the LCCS Group notified Wilson of the existence of the release or threatened release of hazardous substances at the LCCS Site, and that the LCCS Group intended to take steps to eliminate the release or threatened release of hazardous substances at the LCCS Site, and offered Wilson the opportunity to voluntarily join in the LCCS Group's efforts at the LCCS Site.

481. To date, Wilson has not paid its equitable share of LCCS Site response costs.

## COUNT I – CONTRIBUTION UNDER CERCLA

482. The LCCS Group realleges and incorporates by reference Paragraph Nos. 1 through 481 of this Complaint as if fully restated herein.

483. Section 107(a)(4) of CERCLA, 42 U.S.C. §§ 9607(a)(3)-(4), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of

hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial action incurred by... a State... not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;....

484.     "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

485.     "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed...." 42 U.S.C. § 9601(9).

486.     "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

487.     "Owner" or "Operator" is defined in CERCLA Section 101(20) as "... in the case of an onshore facility or an offshore facility, any person owning or operating such facility...." 42 U.S.C. § 9601(20).

488.     "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States

Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

489.    "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

490.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

491.    The LCCS Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

492.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the LCCS Site which has caused the incurrence of "response costs" by the LCCS Group, within the meanings of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

493.    The LCCS Group is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

494.    Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

495.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), each Defendant is liable as an arranger or generator of materials containing hazardous substances, which materials were disposed at the LCCS Site; and/or a transporter of hazardous substances

who selected the LCCS Site for the disposal of such hazardous substances, and who did dispose of such hazardous substances at the Site.

496.     As a result of the release and threatened release of hazardous substances at or from the LCCS Site, the LCCS Group has incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

497.     The response costs incurred by the LCCS Group in connection with the LCCS Site are consistent with the NCP.

498.     Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)....
>
> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....

499.     The LCCS Group has resolved its liability to EPA for matters covered in the OU2 RI/FS AOC.

500.     All Defendants are liable parties under CERCLA, but have not resolved their liability to the LCCS Group or EPA.

501.     To date, the LCCS Group has been compelled to incur and/or otherwise pay over $2 million in response costs at the LCCS Site.

502.     The LCCS Group is entitled to contribution from all Defendants under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for Defendants' respective equitable shares of all

costs and damages incurred by the LCCS Group, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, the LCCS Group respectfully requests that this Court enter a declaratory judgment against all Defendants finding that they are each liable under Sections 107(a)(3) and/or 107(a)(4) of CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), and are obligated under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), to pay for their equitable shares of all past and future response costs, plus interest, associated with the LCCS Site. The LCCS Group further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II – DECLARATORY RELIEF UNDER CERCLA

503.    The LCCS Group alleges and incorporates by reference Paragraph Nos. 1 through 502 of this Complaint as if fully restated herein.

504.    There is a present and actual controversy between the LCCS Group and all Defendants concerning their respective rights and obligations with respect to the response costs associated with the LCCS Site.

505.    Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

506.     The LCCS Group seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

507.     The LCCS Group is entitled to judgment against all Defendants for past and future response costs incurred in connection with the LCCS Site.

WHEREFORE, the LCCS Group respectfully prays that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of all past and future response costs associated with the LCCS Site. The LCCS Group further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

Dated:    June 3, 2016                    Respectfully submitted,

                                          THE JUSTIS LAW FIRM LLC


                                          _____
                                          Gary D. Justis          N.D. IL ID 90785201
                                          10955 Lowell Ave.
                                          Suite 520
                                          Overland Park, KS  66210-2336
                                          Telephone: (913) 955-3710
                                          Facsimile:  (913) 955-3711
                                          Email: gjustis@justislawfirm.com

                                          ATTORNEYS FOR PLAINTIFFS