# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **LCCS GROUP,** | |
| Plaintiff, | |
| v. | Case No. 16 C 5827 |
| **A.N. WEBBER LOGISTICS, INC.,** *et al.*, | Judge Harry D. Leinenweber |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Defendants Interplastic Corporation and Central Michigan Railway bring separate Motions for Summary Judgment. (Dtks. 305, 310.) Plaintiff Lake Calumet Cluster Site Group ("LCCS Group") cross-moves for summary judgment only as to liability and only against Interplastic. (Dkt. 309.) For the reasons stated herein, all three Motions are denied.

## I. BACKGROUND

LCCS Group is a legal entity comprising signatories to an agreement with the United States Environment Protection Agency (the "EPA"). (Pl.'s Resp. to Interplastic's Statement of Facts ("Interplastic SOF") ¶ 1, Dkt. 313-1.) Said agreement obligates the LCCS Group to pay the remediation costs to clean up a Superfund site referred to as the Lake Calumet Cluster Site ("the Cluster Site"). (*Id.* ¶¶ 2-4.) Eager to reduce the apportionment of

liability for that cleanup among its members, the LCCS Group seeks in this suit to add additional parties to its number, including Interplastic and Central Michigan. (*See generally* Compl., Dkt. 1.) In this vein, the LCCS Group seeks those parties' contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3)-(4), and declaratory judgment as to the liability of those parties, *see* 42 U.S.C. § 9613(g)(2). (Compl. ¶¶ 482-507.)

### A. Interplastic Corporation.

Interplastic's role in this case arose from a single delivery to the Cluster Site: an August 6, 1979, load of fifty drums of "waste resin" shipped from Interplastic's facility in Minneapolis. (Interplastic SOF ¶¶ 25-28.) The exact components of that resin are unknown, but the only resins Interplastic produced at that time were unsaturated polyester resins ("UPRs"). (*Id.* ¶ 10.) All of the UPRs Interplastic produced during the relevant time period contained anhydride and styrene as raw materials. (*Id.* ¶ 11.) Some of those UPRs also included as raw materials one or more of the following: adipic acid, diethylene glycol, ethylene glycol, fumaric acid, methyl methacrylate, and phthalic anhydride. (*Id.* ¶ 12.) In their raw forms, each of those materials appears on the EPA's "List of Lists," a non-exclusive enumeration of substances deemed "hazardous" for the purposes of determining CERCLA liability. (*Id.* ¶ 13.)

All UPRs are thermoset polymers. (*Id.* ¶ 17.) Thermoset polymers are designed to undergo a chemical reaction known as curing which transforms the polymers (presumably originally in a liquid state) into solids. (*Id.* ¶ 18.) Interplastic maintains that once thermoset polymers solidify, they cannot break down into their constituent parts. (*Id.* ¶ 18.) Plaintiff at once seems to admit to this fact (*see id.* (objecting not to the *content* of Interplastic's claim of irreversibility but merely to the claim's *materiality*)) and also dispute it (*see id.* ¶ 17 (contending that Interplastic's assertions as to the irreversibility of polymerization do not account for intervening forces which could effect a breakdown of the UPRs at the Cluster Site)). To any extent, Interplastic also contends that all UPRs inevitably cure into solids; Plaintiff dispute this as well. (*Id.* ¶ 20.)

Interplastic sold the UPRs it produced in liquid form — the form usable to the customer. (*Id.* ¶ 19.) To enhance the viability of its product, Interplastic added inhibitors to the UPRs it distributed to delay their solidification and extend their shelf life. (*Id.*) But when Interplastic's manufacturing process went awry, resulting in unusable "waste resin," Interplastic added a "significantly lower" volume of inhibitors to the batch, recognizing it was unsuitable for sale. (*Id.* ¶ 20.) Interplastic treated its waste resin on-site in Minneapolis by placing it in a "hot box" and polymerizing it, causing the waste resin to solidify.

(*Id.* ¶ 24.) On rare occasion, the waste resin would not fully cure even after "hot box" treatment. (*Id.* ¶ 16.) In such instances, Interplastic contracted to have that resin transported for off-site disposal. (*Id.*) The fifty barrels of waste resin delivered to the Cluster Site in 1979 appear to have been the object of such an arrangement. (*See* Interplastic's Resp. to Pl.'s Facts ¶ 15, Dkt. 316; LCCS Interplastic Site Records, Ex. D to Pl.'s Mot. for Summ. J., Dkt. 309-8.) Though the parties dispute whether Interplastic manufactured the waste resin contained in those barrels, the uncontested documentation indicates that the barrels originated with Interplastic. (*See* Dkt. 309-8.)

### B. Central Michigan Railway.

Central Michigan is the corporate successor to Lakeshore Terminal & Pipeline Company, which Plaintiff contends arranged for a third-party entity called Inland Waters to deliver 2,800 gallons of flammable jet fuel waste from Lakeshore to the Cluster Site on June 24, 1982. (Pl.'s Resp. to Cent. Mich.'s Statement of Facts ("Mich. SOF Resp.") ¶ 5, Dkt. 314-1; Cent. Mich.'s Reply to Pl.'s Statement of Additional Facts ("Mich. SOF Reply") ¶¶ 2-3, Dkt. 323-2.) The waste disposal manifest describing that shipment lists Lakeshore as the waste's "generator." (Manifest, Ex. F to Cent. Mich.'s Mem. in Supp. of Summ. J., Dkt. 306-1.) Central Michigan concedes that it stored that jet fuel waste in a tank on its premises yet maintains it neither owned the fuel nor arranged for

its disposal. (Mich. SOF Resp. ¶¶ 6-8.) Rather, according to Central Michigan, the U.S. Department of Defense owned that fuel, Central Michigan merely stored it on DOD's behalf, and it was DOD that contracted with Inland Waters for the fuel waste's removal to the Cluster Site. (*Id.* ¶¶ 6-10.)

## II. DISCUSSION

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

The dispute at bar concerns CERCLA, which Congress enacted to "promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe. Ry.*

*Co. v. United States*, 556 U.S. 599, 602 (2009) (citations omitted). To establish liability under CERCLA § 107(a), the plaintiff must show: (1) the site in question is a "facility" as defined in § 101(9); (2) the defendant is a responsible person under § 107(a); (3) a release or a threatened release of a hazardous substance has occurred; and (4) the release or the threatened release has caused the plaintiff to incur response costs. *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994) (citations omitted). There are four classes of "responsible persons": "the current owners and operators of the cleanup site; the owners and operators at the time that the hazardous substance was disposed; parties that 'arranged for' disposal of the substance; and parties that accepted the substance for transportation to a disposal site of their choosing." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 689 (7th Cir. 2014) (citing 42 U.S.C. § 9607(a)).

Though ultimately not central to the disposition of the motions at bar, the above-recited causation element generates some consternation among the parties. For the sake of completeness, the Court briefly notes its views on the subject. As far as causation is concerned, CERCLA requires only that a plaintiff show that a hazardous substance was released and that said release caused the plaintiff to incur response costs. *See Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992); *see*

*also* 42 U.S.C. § 9607(a). "[N]othing in the language of CERCLA requires plaintiff to prove that defendant *caused the particular release* that caused plaintiff to incur costs." *Premium Plastics v. LaSalle Nat. Bank*, 904 F. Supp. 809, 815 (N.D. Ill. 1995) (emphasis added) (citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 264 (3d Cir. 1992)). Interplastic argues that this rule applies only when the plaintiff is the United States government, as opposed to a private party. The Eighth Circuit supports that view, *see Freeport-McMoran Res. Partners Ltd. P'ship v. B-B Paint Corp.*, 56 F. Supp. 2d 823, 842 (E.D. Mich. 1999) (citing *Farmland Indus. v. Morrison-Quirk Grain Corp.*, 987 F.2d 1335 (8th Cir. 1993)), but it occupies a minority position. Other courts, including the courts of appeals for the First, Second, Third, and Fourth Circuits, believe otherwise, *see Premium Plastics*, 904 F. Supp. at 814 (collecting cases), as do courts in this District, *see id.*; *Am. Nat. Bank & Tr. Co. of Chi. v. Harcros Chems., Inc.*, No. 95 C 3750, 1997 WL 281295, at *10 (N.D. Ill. May 20, 1997) (rejecting heightened causal connection requirement for claims pursued by private party); *see also Farmland Indus., Inc. v. Colo. & E. R. Co.*, 922 F. Supp. 437, 440 (D. Colo. 1996) (same). The Court agrees with these decisions and disagrees with the distinction Interplastic advances. "Liability [under CERCLA] is imposed when a party is found to have a statutorily defined 'connection' with the facility; that connection makes the party

responsible regardless of causation." *United States v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008) (citation omitted).

Turning to the parties' motions: Both Interplastic and Central Michigan move for summary judgment, contending that neither of them can be held liable under CERCLA as a matter of law. Plaintiff cross-moves for summary judgment as to liability against only Interplastic. The Court turns first to the dueling motions concerning Interplastic before addressing the motion by Central Michigan.

### A. Interplastic and Plaintiff's Cross-Motions for Summary Judgment

Plaintiff contends that Interplastic arranged for the disposal of the fifty drums of waste resin at the Lake Calumet Cluster Site and so is a potentially responsible party ("PRP") under CERCLA. *See* 42 U.S.C. § 9607(a)(3) (setting forth PRP liability for "arrangers"). In moving for summary judgment, Interplastic does not dispute that it "arranged for [the] disposal" of the waste resin. Instead, Interplastic contends that the waste resin it arranged for disposal had irreversibly solidified, rendering it inert and thus beyond the scope of those substances deemed "hazardous" under CERCLA.

"Hazardous" has a broad meaning within CERCLA, comprising:

(A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated

- 8 -

pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C.A. § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C § 9601(14). In accordance with Section 9602, the EPA has promulgated a list of substances it deems "hazardous." 42 U.S.C. § 9602. That so-called "List of Lists" appears at 40 C.F.R. § 302.4 and does not contain resin, waste resin, polyester resin, or USPs. And yet, the List does contain both styrene and maleic anhydride—two substances Interplastic admits it used as raw materials in its USPs. *See id.* Herein lies the heart of the parties' dispute. Plaintiffs contend that because Interplastic's USPs "contained" hazardous materials, the USPs were themselves hazardous under CERCLA. Interplastic disagrees, arguing that the

elemental and non-removable building blocks of its products cannot expose them to liability.

Plaintiff's argument relies heavily on *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996), *overruled on other grounds as recognized in New York State Electric & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 220 (2d Cir. 2014), in which the Second Circuit explained that "[l]iability under CERCLA depends only on the presence *in any form* of listed hazardous substances," and, as such, "it makes no difference [if] the specific wastes disposed of . . . [are] not themselves listed as hazardous substances" so long as their component parts are so listed. *Id.* at 515-16 (emphasis added) (citation and internal quotation marks omitted); *accord La.-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1573 (9th Cir. 1994) (holding that even if a product is not specifically listed as a hazardous substance, it qualifies if its components include hazardous substances). But as Interplastic points out, the PRP in *Betoski* "was accused of dumping waste that contained hazardous substances *in separable, identifiable forms*." 99 F.3d at 516 (emphasis added). The matter before the Second Circuit was thus afield of the issue relevant here, where Interplastic contends the once-harmful components of its waste resin had chemically changed into a new, inert substance. Indeed, the *Betkoski* opinion recognized as much: The alleged PRPs in that case cautioned that the court's view would "lead to CERCLA liability if a discarded

- 10 -

object had any EPA listed hazardous substance in its chemical genealogy, whether or not the chemical component's characteristics had been unalterably changed in the manufacturing process"; the court rejoined simply that "[e]ven if this objection is sound in theory, it is not relevant." *Id.* The Second Circuit considered allegations concerning waste containing separable, identifiable hazardous substances, and it clearly limited its holding accordingly. *Id.*

Given that *Betkoski* did not consider the theory advanced here, Interplastic contends the Court should look instead to *United States v. New Castle County*, 769 F. Supp. 591 (D. Del. 1991). The material considered there was polyvinyl chloride resin, or "PVC," a staple component in many plastic products. *Id.* at 594-95. Like Interplastic's waste resin, PVC is a solid at STP—chemistry shorthand for standard temperature and pressure in normal conditions at sea level—and is not defined as a hazardous substance under CERCLA. *Id.* at 595-96. However, vinyl chloride—one of PVC's integral ingredients—*is* a CERCLA-defined hazardous substance. *Id.* Much like here, the question before the court was whether CERCLA liability attaches when a defendant disposes of a waste that contains a hazardous substance. *Id.*

However, *New Castle County* diverges from the current case in one respect. The parties in that case agreed that PVC neither depolymerizes nor decomposes under normal landfill conditions, so

it was undisputed that the previously-hazardous vinyl chloride was permanently bound within the PVC and could not be the hook for liability. *Id.* at 597. However, the parties also agreed that PVC contains trace amounts of *unreacted* vinyl chloride, which could, if heated in a vacuum, be freed from the PVC. *Id.* Those unreacted traces were the sole object of contention in the case. The court held that when a defendant's waste is a non-hazardous substance, the plaintiff must show the waste "is *capable* of generating or releasing a hazardous substance at the site in order to show that the defendant's waste 'contains' a hazardous substance" under CERCLA. *Id.* The plaintiffs failed to make that showing, so the court refused to find liability. *Id.* at 598.

The *Betkoski* court did not find *New Castle County* persuasive, *see* 99 F.3d at 517, and yet *Betkoski* acknowledged that when a hazardous substance is used only in a non-releasable form in the manufacturing of a product, it might "scientifically be impossible" for the plaintiff to show the required "threatened release," *id.* at 516. *Betkoski* cautioned, however, that scientific impossibility is a high bar—hazardous substances releasable only upon the introduction of an intervening force still suffice for CERCLA liability. *Id.* (remarking that district court acted contrary to precedent in finding no liability where the hazardous substance could be released only by an intervening force).

Against this backdrop, this Court concludes that when the disposed-of waste is not itself a hazardous substance and the waste contains hazardous substances which are irreversibly bound within the waste, a CERCLA plaintiff cannot make out its *prima facie* case. But if separating out those hazardous substances is at all possible, even only upon the intrusion of an intervening force, then the defendant may be susceptible to liability. *Id.* at 516; *see Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*, 255 F. Supp. 2d 134, 155 (W.D.N.Y. 2003) (stating that to establish liability, "independent releasability of the substance, *i.e.*, without effect of an intervening force, need not be established"); *but cf. United States v. Serafini*, 750 F. Supp. 168, 170-71 (M.D. Pa. 1990) (holding that the defendant could not be held liable under CERCLA for depositing waste which, although not itself a hazardous substance, could release hazardous substances when burned). The questions related to the actual occurrence of and results from such intervening forces are relegated to the apportionment of liability and have nothing to do with determining liability in the first instance. *See Betkoski*, 99 F.3d at 516.

Interplastic contends its waste resin provides no basis for liability. It argues that because polymerized resin permanently binds together its composite elements, no intervening force of any strength or kind can release its hazardous components and so

Plaintiff cannot establish the *prima facie* element of threatened release. This argument fails in two respects. First, it ignores the parties' dispute over whether UPRs remain permanently cured once polymerized. And second, the argument ignores that to win on summary judgment, Interplastic must prove not only the polymerization's irreversibility, but also that the particular waste resin Interplastic arranged for disposal was fully cured (and thus immutably non-hazardous) as opposed to partially cured (and thus potentially still hazardous, *i.e.*, by "containing" a hazardous substance).

The record is unclear on this last point. These are the competing facts: Interplastic says that all UPRs eventually cure, but Interplastic also contends that whenever a batch of its UPR failed to "fully cure," Interplastic contracted to have that waste "*liquid* resin" disposed of. (Interplastic SOF ¶¶ 16, 20.) Interplastic also contends that because waste resin contains significantly less inhibitor volume than consumer-worthy resin, waste resin "could cure as quickly as a matter of hours, and typically within several days." (*Id.* ¶ 20.) This is puzzling. If waste, liquid resin self-hardens within a matter of days, why would Interplastic go to the trouble of arranging for its off-site disposal?

This puzzle aside, two questions of disputed, material fact preclude summary judgment to either party: (1) whether fully-cured

UPRs are unalterably polymerized, even upon the introduction of an intervening force, and (2) if so, whether Interplastic arranged for the disposal of fully-cured, as opposed to partially-cured, resins. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1201 (2d Cir. 1992) ("When a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability.").

On the current record, neither Plaintiff nor Interplastic is entitled to judgment as a matter of law. A reasonable jury could find in either's favor on the two key questions. Accordingly, both motions for summary judgment are denied.

**B. Central Michigan's Motion for Summary Judgment.**

As with the Interplastic-related motions, the central dispute in this final motion is whether Central Michigan qualifies as an "arranger" and is thus a responsible person under CERCLA. Ultimately, Central Michigan fails to prove as a matter of law that it does not so qualify, so the Court cannot grant summary judgment in its favor.

To show that Central Michigan is an "arranger," Plaintiff must show that Central Michigan: (1) owned or possessed (2) hazardous substances and (3) by contract, agreement, or otherwise, arranged for disposal or treatment, or arranged for transport for disposal or treatment, of those substances at the CERCLA-defined facility. *Carolina Power & Light Co. v. Alcan Aluminum Corp.*, 921

F. Supp. 2d 488, 496 (E.D.N.C. 2013) (citation omitted), *aff'd sub nom. Consolidation Coal Co. v. Ga. Power Co.*, 781 F.3d 129 (4th Cir. 2015); *see* 42 U.S.C. § 9607(a)(3). In more simple terms, the Supreme Court has defined "arranger" by its ordinary meaning: an entity that takes "intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009) (citing *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996)).

Plaintiff clears the first hurdle with ease. Central Michigan maintains that DOD, and not it, owned the jet fuel. But this quibble over legal title avails Central Michigan of nothing. Central Michigan cannot reasonably contend it did not *possess* the fuel, which is all the statute requires. 42 U.S.C. § 9607(a)(3). Central Michigan stored the jet fuel in tanks on its property. That suffices to establish possession. *Cf. GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 448 (6th Cir. 2004) (collecting cases and observing that even constructive possession (*i.e.*, control over the hazardous substance) "may suffice where literal ownership or possession falls short").

The Court has little to say about the second element, *i.e.*, whether the fuel waste was hazardous. Neither party's statements of material facts stake a claim as to the hazardousness of the waste, but both parties refer to the fuel waste as a hazardous substance in their briefing. (*See* Pl.'s Resp. to Cent. Mich.'s

Mot. for Summ. J. 1, Dkt. 314 ("Central Michigan . . . does not dispute that the waste contained hazardous substances."); Cent. Mich.'s Reply in Supp. of Summ. J. 8, Dkt. 323 (referring to the disposed-of fuel waste as a "hazardous substance").) There appears to be no dispute between the parties on this score.

As for the final element, whether Plaintiff actually arranged for the waste's disposal: Central Michigan says it is free from liability because all of the decision-making and logistics related to the fuel's transportation and removal were handled exclusively by DOD. Central Michigan points to a few exhibits in support of that contention, but none is very persuasive. Central Michigan contends that a June 30, 1982, letter from Lakeshore's manager to DOD showcases Lakeshore taking responsibility for the fuel waste disposal. (*See* Ex. E, Dkt. 306-1.) This is one reasonable reading of the letter. Another is that as owner of the tanks, Lakeshore simply used this letter to report back to DOD concerning the work DOD-retained contractors completed on-site. (*See id.* (recounting simply that the fuel waste "was taken to a disposal site in Chicago").) The other set of exhibits are internal DOD memoranda from 1981 in which DOD recites the then-newly unveiled EPA regulations concerning the disposal of the type of waste held in Central Michigan's tanks. (*See* Exs. C-D, Dkt. 306-1.) Central Michigan argues that these memos are proof of DOD's responsibility not simply for some unrelated wastes in its control but rather

specifically for the fuel waste initially held by Central Michigan. This conjecture is a leap too far; it is not supported by the memos themselves nor by any supporting documentation.

Clearly, *someone* arranged for Inland Water to dispose of the fuel waste at the Cluster Site. It might have been DOD; it might have been Central Michigan (as Lakeshore). But either is possible from the present record. Plaintiff suggests that the fuel-storage agreement between DOD and Lakeshore might elucidate those parties' responsibilities vis-à-vis disposal. But that agreement, if one exists, is not before the Court now. On this record, a reasonable jury could conclude that either Lakeshore or DOD arranged for the waste disposal, so summary judgment is not appropriate.

### III. CONCLUSION

For the reasons stated herein, Interplastic's Motion for Summary Judgment (Dkt. 310), Central Michigan's Motion for Summary Judgment (Dkt. 305), and Plaintiff's Motion for Summary Judgment (Dkt. 309) are all denied.

**IT IS SO ORDERED.**

                         Harry D. Leinenweber, Judge
                         United States District Court

Dated: 9/19/2018